## Philip Francis Thomas, Comptroller, *vs.* Jas. S. Owens, Treasurer.

The 1st section of the 6th article of the constitution provides, that the Comptroller shall be "chosen at each election of members of the House of Delegates," and the 4th section of the 3rd article provides, that the members of the House of Delegates shall be elected "to serve for two years from the day of their election." HELD:

That it does not necessarily follow, from the language of either or both these sections, that they fix the *term* of service of the *Comptroller* at two years *from* the day of his election.

The 4th section of the 1st article provides, that *every* person *elected* or appointed to any office under the constitution, shall take the oath therein prescribed "*before* he shall enter upon the duties of such office." HELD:

That the Comptroller could not be considered as in office, and entitled to the salary affixed to that office, until he *qualified* by taking the oath prescribed by this section; such qualification is an indispensable *prerequisite* to his investiture with the authority and responsibilities of the office.

Such qualification does not, by operation of law, relate back to the day of his election, and entitle him to compensation from that time.

The *dictum* in *Marbury vs. Madison*, 1 *Cranch.*, 151, that "a commission bears date, and the salary of the officer commences from his appointment, and not from the transmission or acceptance of his commission," cannot receive the assent of this court, as a proposition applicable to every instance of a commissioned officer.

The design of the constitution of this State, and of its framers, in this respect, was to make no gratuities, but to pay for services actually rendered, and that no one under it is authorised to claim a salary attached to an office, until he has accepted and qualified himself by taking the prescribed oath.

Though it is nowhere expressly said in the constitution that the Comptroller shall continue in office until his successor is duly qualified, yet it is obvious from its spirit and policy, as manifested in its provisions affecting other officers in this respect, that it was not its design that there should be an interregnum in the office of Comptroller.

The 1st section of the 6th article provides, that the Comptroller and Treasurer "shall take such oath and enter into such bonds, &c., as the legislature shall prescribe," and by the act of 1852, ch. 12, the legislature prescribed an additional oath, and fixed the form and penalty of the bonds. HELD:

That persons elected to these offices prior to the passage of that act, were constitutionally in office when they qualified by taking the oath prescribed by the 4th section of the 1st article of the constitution, and were entitled to their salaries from that time; the passage of that act was not a necessary prerequisite to a constitutional qualification.

All that was required of them was to qualify according to *existing laws*, liable however to any demand the legislature might thereafter make on them, and on their failure to comply therewith, to be deemed as having resigned their offices.

Where the constitution defines the qualification of an officer, it is not within the power of the legislature to change or superadd to it, unless the power be expressly or by necessary implication given to it.

Under the grant of power given in the 1st section of the 6th article, it is competent to the legislature *at any time* to alter the oath or bond prescribed by the act of 1852, ch. 12; the exercise of this power is not confined to its first exertion by the legislature, *but extends to all time.*

A *subsequent* exercise of legislative power altering the oath or bond prescribed by the act of 1852, ch. 12, could not have the effect of rendering the acts of these officers who had complied therewith illegal and void, yet such would be the irresistible consequence, if the construction that there could be no constitutional qualification until the passage of that act were the true one.

The constitution, *proprio vigore*, makes the appropriation for the payment of the salaries fixed in it, by declaring the amount "*shall*" be "*received*" by the particular officer; this is an appropriation *by law;* by the *supreme law* of the State, and no legislative act making appropriations for such salaries is necessary.

Each and all departments of the government are subordinate to the constitution which creates and defines their limits; whatever it commands, is the supreme and uncontrollable law of the land.

The 20th section of the 3rd article, that "no money shall be drawn from the treasury of the State, except in accordance with an appropriation made by law," was obviously inserted to prevent the expenditure of the people's treasure *without their consent*, either as expressed by themselves in the organic law, or by constitutional acts of the legislature.

Its purpose is to secure regularity, punctuality and fidelity, in the disbursements of the public money.

In the construction of any instrument the whole paper ought to be considered, that the will of its framers may be truly and accurately ascertained; the objects contemplated and the purposes to be subserved should be constantly kept in view, and the language used interpreted in reference to the manifest intent.

The *people*, by their adoption of the constitution, made the appropriation for the salaries of the officers fixed by it, and this *fiat* of the supreme will cannot be nullified by the *ipse dixit* of a mere *ministerial* officer, such as the Treasurer.

In assigning the powers of government to three different departments, the constitution intended to secure to each its independency of action, and the more effectually to ensure this, it ascertained and appropriated the salary they are severally to receive, and inhibited the legislature from diminishing it.

An opposite construction would countenance the paradox, that a co-ordinate branch of the government could stop its whole machinery, by refusing to pay the salaries of those upon whom is devolved the discharge of the duties of the other branches.

The duty of the Treasurer under the constitution is to disburse the public moneys on the warrant of the Comptroller, and not otherwise; the duty of adjusting and settling all public accounts is exclusively conferred upon the Comptroller.

The Treasurer is to respect such adjustment and settlement, and on the warrant of the Comptroller to pay the amount subject to the restrictions:—1st, that the warrant must be in proper form; 2nd, that there must be an appropriation by law; and 3rd, that there must be funds in the treasury to meet the demand.

He has nothing to do with the *elements* of accounts; it is the duty of the Comptroller to ascertain the audit, if there be an appropriation by law; the Treasurer is not required to *preserve* accounts, that duty is imposed on the Comptroller.

If there is an appropriation, and a proper warrant drawn by the Comptroller and presented to the Treasurer, his duty is purely *ministerial*, and if payment be refused *mandamus* is the proper remedy.

The party injured by the delay consequent upon his delinquency may sue his official bond, or bring a special action on the case against him.

The warrant in this case directed the Treasurer to pay a particular sum in payment of so much salary due the Comptroller, "to be paid pursuant to the provisions of the constitution, and also pursuant to chapter — of 1853." HELD:

That the payment of this warrant was properly refused by the Treasurer, because it did not show on its face the *particular* act under which it was drawn.

APPEAL from the Circuit Court for Anne Arundel county.

The appeal in this case was taken from an order of the circuit court refusing to grant a writ of *mandamus*, applied for by the appellant. The facts of the case are fully stated in the opinion of this court and in the following opinion of the court below, delivered by BREWER, J., upon the passage of the order appealed from:

"This case was very ably argued and three points discussed: 1st. At what time did the salary of the Comptroller commence? at the time of his election, at the time of his taking the oath prescribed by the constitution for all officers, or at the time of his taking the oath and giving bond as prescribed by the

Thomas *vs.* Owens.

act of 1852, *ch.* 12? The petitioner contending for the first and the defendant for the last, or, at least, for the second proposition. 2nd. Whether the Treasurer was authorised to pay any part of the Comptroller's salary not included in the appropriation bills? 3rd. Whether this court has the power to issue a *mandamus* in the present case? I do not consider it necessary to argue at length either of the latter points, or to express upon them any decided opinion, which, as emanating from a circuit court, would have but little weight and no authority, and as I concur' with the defendant upon his view of the first point. My impression, however, is, that this court has the power to issue a *mandamus* in the present case, but that the Treasurer is not authorised and cannot be compelled to pay any amount from the treasury, unless an appropriation be made for that purpose by the legislature, in pursuance of and in conformity with art. 3, sec. 20, and art. 6, sec. 2, of the constitution of the State. With regard to the first question, I have no doubt that generally all officers hereafter to be elected under the present constitution, will be entitled to their salaries from the time of their election. The acceptance of the officer is presumed, according to legal principles, and that presumption is confirmed by his subsequent qualification. Some short time must necessarily elapse before the result of the election can be officially and legally ascertained, and a commission, as evidence of that fact, issued to the officer. He may after that be too sick to qualify, or be prevented by many accidents from doing so immediately; until he does qualify according to law, and takes upon himself legally and fully the duties of his station, he is entitled to receive nothing; but when he does so, his character as officer relates back to the period of his election, and entitles him to his salary from that time. The case may be made otherwise as to any particular office, by any special provision, or where the office is not vacant until the qualification of the successor. Such I believe has been the practice in this State, and under the general government. But when a new constitution is to be formed to supersede an old one, in order to prevent an

*interregnum,* special provisions must be made, necessarily, to enable each department of the new government, and each officer in it, to take their alloted places, as convenience and perhaps necessity will admit, each new officer to supersede the old, and the constitution may be for a considerable time in this state of transition. One circuit court, with its one judge, may be completely organized, while in another part of the State the old district court, with its three judges, may remain, and so with other parts of the government. With a view to this, the provisions of the constitution, with regard to the holding over of officers, must have been framed. It could hardly have been intended, that the corresponding parts of the old and new constitutions should exist simultaneously—that there should be a district and a circuit court at the same time in the same section of the State, or the old and new treasury department existing at the same time. Let us now look at the actual provisions of the constitution with regard to the treasury department. By the old constitution the Treasurer had the whole control of it. By the 1st section of the 6th article of the new constitution, "a Comptroller is to be chosen by the qualified electors of the State at each election of the members of the House of Delegates, who shall receive an annual salary of $2500," and a Treasurer, "to be appointed by the two houses of the legislature at each session thereof." Both the Comptroller and the Treasurer are required to take the oath prescribed for all officers by the 4th section of the 1st article, but they are also to take another oath, and to give bond as the legislature shall prescribe. The Comptroller and the Treasurer, together, constituted the new treasury department; and the Comptroller could not be invested with the power of his office until the legislature had prescribed the oath and the bond, and he should have taken the one and given the other, nor until the Treasurer had been appointed and done the same. The department could not be complete without the qualification of both officers. The new Comptroller could not be engrafted upon the old Treasurer to constitute the department, because the old Treasurer had the

25    v.4

exclusive control of the Treasury, held under his old tenure and authority until he should be superseded, pursuant to the provisions of the constitution, and until *his successor should be duly qualified. Article* 10, *section* 8. Neither could the Treasurer assume the duties of his office until the Comptroller *should be duly qualified,* for he could pay *nothing* or *receive. nothing* until the Comptroller issued his drafts. Both of these officers constituted the successor of the old Treasurer, and until both had qualified he could not be superseded. The Comptroller alone could not, in any possible view of the case, be considered his successor. It might be claimed for the Treasurer with some degree of plausibility; neither of them, however, represented him fully; neither succeeded to all his duties. Most of the other salaried officers of the State were authorised by the constitution, including the judges, by whose cases this of the Comptroller has been attempted to be illustrated, to terminate the offices and holding of their predecessors *as soon after their election* as they should think proper by qualifying themselves. The Comptroller could not. The time and mode of his qualification depended, by the provisions of the constitution, upon another department of the government, which could not hold its session, by the provisions of the same constitution, until the fourth Wednesday of January, and to whom some time must necessarily be allowed for convenient action. *Art.* 6, *sec.* 1, and *art.* 3, *sec.* 7. The Comptroller is to be elected at each *election* of members of the House of Delegates. They, with most all other officers, are to be chosen on the first Wednesday in November, *then* to serve for two years from the day of their election; and it has been contended that the Comptroller, therefore, is to serve for two years from the day of his election, and his *office* to commence from the day of his election. And the concluding counsel, who argued the whole case with his usual great ability, has said, that *as to salary,* at least it commenced on that day; his office enduring for two years, commencing on the day of his election and ending on the day of the next election by the people, and his salary being $2500 annually.

It appears to me that the Comptroller is not in a better situation, as to this, than any other officers elected at the same period. There is no provision in the constitution that he "is to serve for two years from the day of his election," if that would make any difference, and notwithstanding the provision with regard to the delegates, they are paid a *per diem* compensation, and though after their session has commenced at the prescribed period, (the first Wednesday of January,) they have conceived themselves entitled to that *per diem* whether they attend or not, I have never understood that it was contended by them or any one else that they were entitled to it for the whole period of their election. For some extent, all public officers hold their offices from the day of their election. It authorises some of them to qualify when they please, others, as the Comptroller and the legislature, when the prescribed period arrives; but they hold not as to their salary but as to their office alone, it being more of a right to hold, incomplete until that time, than an actual holding. As to the salary being annual, it seems to me to mean that the occupant of the office was to receive this salary at that rate in proportion to the time he occupied it. The appointee in the place of one dead or resigned is entitled to the same annual salary, yet he holds only part of the year. *Art.* 6, *sec.* 1. The case of the judges is also adduced as an illustration and confirmation of the views of the petitioner. The judges of the Court of Appeals, by the fourth section of article fourth, "shall hold their offices for the term of ten years from the time of their election," but the judges of the circuit courts and the courts in Baltimore shall hold their offices for the term of ten years, omitting "from the time of their election." I understood the concluding counsel to say in this part of his argument, that there was no difference as to the effect of these two provisions, but that both must mean that they should hold from the time of their election; but if a difference was intended by the framers of the constitution, we may, as to the Court of Appeals, conceive a reason why that difference was made. In the old judiciary system,

established by the act of 1804, ch. 55, the State was divided into districts, and for each three judges were to be appointed, "one of whom should be styled in the commission chief judge, and the other two, associate judges of the district for which they should be appointed." By the fifth section it was provided, that the Court of Appeals should be composed of the chief judges of the several judicial districts of the State. They had no distinct separate appointment as judges of the Court of Appeals. They, with their associates, were judges of the districts, and were to be superseded *as such* by the qualification of the circuit judge, who was, in fact, their successor, and might qualify immediately after his election; and as soon as one circuit judge should qualify, all judges of the district, identified with that circuit, would be superseded, the integrity of the Court of Appeals would be broken, and the remnant could not occupy that position. The new Court of Appeals might be considered the successor of the old, but no one judge could be the successor of any individual judge so as to supersede him. But the framers of the constitution probably entertaining this opinion, and foreseeing that not only one but all the circuit judges *might* qualify immediately, intended to provide, that the new Court of Appeals should hold their offices from the time of their election, more especially as the court, by the provision of the constitution, was to sit very shortly after the election. The provision, therefore, with regard to that court might be a sensible, proper, and necessary one. With regard to the judges of the circuit courts, the case is certainly different. The 8th section of article 10th unquestionably applies to them. The old judges of the district courts held and might exercise in all respects their offices, and were, therefore, entitled to their salaries until the circuit judges qualified. There could not be, as I repeat, a district and a circuit court in one and the same territorial division. The same principle applies, as I have before said, to the treasury department. There could not be two treasuries, or one treasury and part of another at the same time. I cannot think that the framers of the constitu-

tion ever intended that there should be two co-existent officers, identically the same, and two salaries payable for the same offices, and it would require a very clear and positive provision to induce me to think otherwise.    It appears from the Treasurer's answer to the petition, that a part of the amount claimed by the petitioner is admitted to be due, but no appropriation having been made for its payment and the draft specifying a larger amount, I do not see how this court can compel the Treasurer to pay it."

The cause was argued before .LE GRAND, C. J., ECCLESTON and TUCK, J.

*Thomas G. Pratt* for the appellant.

1st. As to the period when the salary commences:  This depends upon the construction of the constitution.  1st sec., *art.* 6, requires the Comptroller to be elected on the day of the election of delegates to the General Assembly.  The election by the people was substituted for the executive appointments, and confers upon the parties elected all the rights and privileges conferred upon them by the appointments previous to the adoption of the new constitution.  If any officers previously appointed would have been entitled to their salary from the day of their appointment, the same officers will be entitled to their salaries from the day of their election.  The officers received their pay when appointed by the governor from the date of their commission, because the commission was the appointment.  But now the commissions are mere *certificates of election,* certifying that upon some preceding day the people elected the party to the office; they do not confer the power to discharge the duties of the office.  This officer was elected on the 5th of *November* 1851.  The view of the judge below, that the Treasurer and Comptroller constitute one department, and succeed the old Treasurer, is manifestly erroneous.  He had not bonded on the 1st of January 1852, yet the legislature, by the act of 1852, ch. 119, gave the salary to the Comptroller from the 1st of January

1852. This shows that his bonding and taking the oath which was prescribed by the act of 1852, ch. 12, was not the period from which his salary was to commence. The same act of 1852, ch. 119, gave to the judges of this court their salary from the 1st of January 1852, and yet the constitution requires them to hold a court on the 1st of December preceding, and they did so qualify and hold their court, and it is conceded that from that day they are entitled to their salary. The convention designed that the Comptroller should receive his pay from the time of his election, because there was a new department to be organised and commenced. It is known that from the date of his election he was engaged in making preparation for this organization, examining the systems of other States that had established like departments, and making all necessary and needful preparations for the duties of his office. There is no doubt the constitution designed to give an *annual* salary of $2500 to this officer, and this is an appropriation of this sum *annually* to the Comptroller. The ground taken on the other side is, that he was not to enter on the discharge of the duties of his office on the day of his election—he can never do this from the day of the election—but the constitution does not require him to hold over till his successor qualifies—he is to hold only till the *election* of his successor; thus there will always be, according to the construction on the other side, a period when there will be no Comptroller, and hence the provision of the constitution that the salary shall be $2500 will be defeated. 2 *G. & J.*, 278. The same argument that would give to the successor of the late Comptroller the salary from the day of his appointment, would likewise give the same to the late Comptroller. That the officer is entitled from the day of his appointment, is sanctioned by the practice of every State in the Union, and by that of the United States. The salary commences from the appointment, and not from the delivery of the commission. 1 *Cranch.*, 161, *Marbury vs. Madison.* Unless this construction is the true one, this court will have to fix the period when the salary is to commence. The counsel on the other side say

it commenced from the time he took the oath and qualified, by giving bond, &c., but this construction the legislature have repudiated. The election undoubtedly conferred on the officer elected some constitutional right which was beyond the control of the legislature. Yet if the legislature should refuse to prescribe the oath and bond until his term expired, according to the theory on the other side, he would not be entitled to his salary. What them becomes of the rights conferred upon the officer by the constitution?

2nd. The constitution appropriates the money for the payment of this salary, and no legislative appropriation is necessary. Suppose the legislature should appropriate less than $2500; have they the power to repeal or annul this provision of the constitution? They cannot do it by direct legislation, neither can they do it by *non action*. Suppose they had passed a law abolishing this office, this court would not hear an argument on the *constitutionality* of such a law. There can be no distinction drawn between this office and any other offices in the constitution. If the legislature can abolish this by refusing the appropriation, so they can every other one where the salary is fixed by the constitution. No man can doubt but that the intention of the constitution was to place this matter beyond the control of the legislature. It has been the pride of Maryland that its judiciary should be independent, hence the salaries and terms of office of the judges are fixed by the constitution. So it is with the librarian; the constitution, in order that the legislature might not have control over him, fixes the salary and *term* of his office. Art. 4, sec. 4, gives to the judges their term of office for ten years from the time of election, and gives them the salary of $2500 *annually*. The design of this was to render the judges independent of any appropriation on the part of the legislature. But it is supposed that art. 3, *sec.* 20, renders an appropriation necessary. But if the constitution has appropriated this money to a particular officer, the question arises, is not this an appropriation "*by law?*" The constitution is the supreme law of the State, and no legislative action in this particular is necessary. The

two clauses, (that of art. 6, sec. 1, and art. 3, sec. 20,) are found in the same instrument, and are to be construed in *pari materia.* The 20th sec. of art. 3, refers to an entirely different class of cases, and was designed to effect different objects. Why require the legislature to appropriate, when they have not the power to refuse, in reference to the salaries of officers fixed by the constitution? The object of the *20th sec., art* 3, was to require the law, which makes an expenditure for any particular purpose, such as building a bridge, &c., to fix the amount of money to be expended in it. Such was the construction and practice under the old constitution, for these very words were put into the old constitution by the act of 1843, ch. 399, confirmed by the act of 1844, ch. 86, yet from that time down to the adoption of the new constitution, no general appropriation bill, such as that of 1852, was ever passed for the salaries of the judges, &c.: because the legislature then knew that where a law made an appropriation, there was no necessity for another law for the same purpose. Art. 56 *of old constitution,* was the only provision in reference to the salaries of the judges of the Court of Appeals, and under this the judges were paid, without any other law making an appropriation for them.

3rd. The appellant is entitled to the remedy by *mandamus.* This point assumes the establishment of the antecedent propositions. *4 H. & McH.,* 449, *Rankel vs. Winemiller*, speaks of the character of the writ of *mandamus.* Wherever there is an established right in a citizen, and he has no legal remedy, the writ of *mandamus* is the remedy *ex necessitate.* 1 *Cranch.,* 154. The act of 1806, ch. 90, sec. 9, confers on the county courts all the power which the general court previously had, and the latter, by the case in *4 H. & McH.,* 449, had all the power that the court of *King's Bench* in England had. So that the circuit court in this case had all the power over the subject of *mandamus* that the court of *King's Bench in England* has. That a *mandamus* will lie in such a case, see 12 *Pet.,* 626, *Stockton vs. Stokes. Ib.,* 609, *Kendall vs. The United States.* The treasurer has no discretion, and the courts, *ex necessitate,*

Thomas *vs.* Owens.

have the power to command him to do the act. Was it the design of the constitution that the Treasurer should have any discretion over this subject? This is a question of vital importance to the public at large, and requires a sound construction from this court.

*Jervis Spencer* for the appellee.

There were several questions discussed in this case in the lower court, and the same questions arise here.

1st. That it is not competent for the courts to assume an indirect jurisdiction over the State through its officer, and by a *mandamus* or any other proceeding take the money out of the treasury, which may be required to meet other pressing emergencies. Such a power in the courts would be an infringement upon State sovereignty. 14 *Pet.*, 518. 6 *How.*, 100. 2 *Texas*, 498. It is submitted that this cannot be regarded as a proceeding against the Treasurer individually, apart from his character as the custodiary of the treasury of the state. 11 *How.*, 289.

2nd. If it could be so regarded it could only be upon the assumption, that by the order of the State he held the money for the use of the relator, not in his official character, and separated from the treasury, in which case he might be sued in a simple action of assumpsit for money had and received. *The Mayor vs. Howard,* 6 *H. & J.,* 394. 1 *H. & G.,* 265. *Cowp.,* 476.

3rd. The application for the *mandamus* assumes, that the salary commences from the day of election. If this be correct, the principle applies to other officers *multo fortiori.* The language of the constitution, as to the Comptroller, is: " *There shall be a treasury department, consisting of a Comptroller, chosen by the qualified electors of the State, at each election of members of the House of Delegates, who shall receive an annual salary of* $2500." It will be observed that the word here is "*chosen.*" The Comptroller shall be "*chosen,*" without any specification of the time when he shall go in or when he shall go out of his office. *He shall be*

26    v.4

*Comptroller when he duly qualifies;* and as there is no limitation prescribed, he holds, necessarily, until superseded by another officer duly qualified. This the constitution clearly implies. The same section says: "*In case of a vacancy by death or otherwise, the governor, by and with the advice and consent of the Senate, shall fill such vacancy by appointment, to continue until another election by the people,*" &c., &c., "*and the qualification of the successor.*" As the vacancy is understood to exist until *the qualification of the successor,* the original appointment must necessarily be understood to be for the same period. It is absurd to talk about filling a vacancy *by "death or otherwise,"* to continue longer than the original appointment. We therefore contend, that in these words there is nothing specific as to the term of office, *only he shall be chosen and receive $2500 a year as long as he continues in office.* But there are other words in the section that are specific. "*The Comptroller shall take such oath and enter into such bond as the legislature shall prescribe.*" In pursuance of this requirement of the constitution, the legislature passed an act prescribing the oath to be taken and the bond to be executed, on the 13th February 1852, and the Comptroller complied with the act on the 19th of the same month. His term could commence then only. It is contended for the relator, that he was in office and drew his salary before complying with the act. Can this be? If so, this part of the constitution was a nullity and the act of the legislature worse than idle. If he was in the office and competent to perform the duties and receive the emoluments before the law was passed, its passage would not have ousted him, and he could have gone on as well without an oath or bond afterwards as before. The Comptroller was certainly chosen subject to the constitutional restrictions, to wit, *that he should give bond and take the oath that the legislature should prescribe.* This was a matter of common prudence which the Convention could not have overlooked, and necessarily preliminary to an assumption of the control of the treasury of the State. The ground taken for the Comptroller

does not only render the aforesaid provision of the constitution and act passed under it nugatory, but it abolishes the 4th sec. of the 1st art. of the constitution, which prescribes, that "*every person elected or appointed to any office of profit or trust under the constitution or law, made pursuant thereto, before he shall enter upon the duties of such office, shall take and subscribe the following oath,*" &c.

I have said, that if the Comptroller can claim his salary from the day of his election, the right would be much clearer as to other officers. As to senators the constitution says, art. 3, sec. 2, they "*shall serve for four years from the day of their election,*" and the delegates shall be elected "*to serve for two years from the day of their election,*" art. 3, sec. 4; and again, "*the senators and delegates shall receive a per diem of four dollars, and such mileage as may be allowed by law,*" art. 3, sec. 30. We all know that the members of the legislature are liable to be called upon every day in the year in their legislative capacity, and surely these provisions would make a much stronger case for them, if they should demand from the day of their election during the whole two years, than the Comptroller can possibly make. Yet if they should make such a demand, they would hardly be listened to patiently. The same peculiarity applies to nearly all the other officers, the sections of the constitution which prescribe their terms making them commence from the day of election, (subject of course to the qualifications expressed in other sections,) except the Treasurer and Comptroller, as if it had studiously guarded against the use of any language which could be construed to recognize them as in office until they had taken the oath and bonded, this being an essential security in consequence of the pecuniary trust.

But the position of the plaintiff involves another construction that we cannot regard as any thing less than a monstrosity. They say the Comptroller is entitled to his salary from the day of election, although he qualified and was capable of performing the duties of the office not until over three months afterwards. If this be good law with regard to the

Comptroller, it is good in application to all other officers in the State. They say they can claim by virtue of the election, without qualification and services. Another set might claim who were in office waiting the qualification of successors, and thus a liability would attach upon the State to pay two sets of officers. The old Treasurer was undeniably in office until the full qualification of the Comptroller and Treasurer, (art. 10, sec. 8,) establishing the new treasury department.

4th. We likewise say that there is nothing certain and specific in the petition and application of the relator in this case. He says so much money was due him as Comptroller; but how was it due? This he does not show. Whether he claims from such a day and gives so much credit, leaving the balance he claims, or claims from such another day and gives another credit does not appear. The case would require an examination of accounts, which the court will never entertain upon an application for a *mandamus.* The petition and answer make an issue of fact as to the sum due, which cannot be thus tried. 14 *Pet.,* 518. 6 *How.,* 100. 9 *Smedes and Marshall,* 89.

5th. But if every thing else was right in support of the application, *jurisdiction, term of office, salary, and balance due and admitted,* the application could not be granted, because the Treasurer had no authority to pay without an appropriation for the purpose. Art. 3, sec. 20.

It is maintained on the part of the relator, that this case is an exception, as the salary is fixed by the constitution. But we submit that this can make no difference. Every law is a part of the constitution, as much as the leaf that grows out of the tree is part of the tree. What is enacted by the constitution is no more the law and no more binding than an act of the legislature, passed by the authority of the constitution. In their effect and operation they are both alike. The State sovereignty retains to itself the right to say whether money shall be paid out or not, as there may be emergencies of rebellion, foreign invasion, &c., which may require all its resources. It would be destitute of the means of self-preservation if the

ordinary revenue could be paid out by the revenue officers, in paying the ordinary expenses, without special authority.

*Charles F. Mayer* on the same side.

The question when the salary of the Comptroller commences is not raised in the case; the petition does not state the time, and the question is not properly before the court. The only allegation is, that on a certain day he drew a warrant upon the Treasurer, which the latter refused to pay, and he asks a *mandamus* to compel him to pay it. This opens up questions of importance. What are the powers of the Treasurer? What are his duties under the constitution? If the constitution interposes an insurmountable barrier to the demand of the appellant, those barriers cannot be broken through, even though the appellant may have a right to his salary from the day of his election.

The Treasurer is not an appendage or a subordinate of the Comptroller—he has his duties defined and prescribed by the constitution itself as much as the Comptroller. He is to pay upon warrants issued by the Comptroller, but he is not obliged to pay every warrant that may be issued *blindly,* without *examination.* The 20th sec. of the 3rd art., expressly says, that no money shall be drawn from the treasury except in accordance with an appropriation made by law, and every such law shall distinctly specify the sum appropriated and the object to which it shall be applied. This is as much binding upon the *Treasurer* as upon the Comptroller. *Sec. 2, art.* 6, requires the Comptroller to grant, under regulations prescribed by law, all warrants for moneys to be paid out of the treasury, in *pursuance of appropriations by law.* In this case the Comptroller is the judge in his own case, draws the warrant in his own favor, and in such a case every thing was calling upon the Treasurer to be cautious, even if he were to be regarded as a mere ministerial officer. The question then is, has there been a law appropriating the specific sum called for in this warrant? Such has never been done. The only one relied upon is the act of 1852, ch. 119, making appro-

Thomas *vs.* Owens.

priations for the expenditures of the State for the year 1852. This act appropriates *so much as may be necessary* for that year from the 1st of January 1852. This requires an account—an ascertainment of what may be due. There is no averment in the application that this sum was due him from a particular day.

The question here involves the sovereignty of the legislature. The State cannot be subjected to judicial action—it cannot be sued. This *mandamus* strikes at the property of the State. A *mandamus* will not lie to control an executive officer in his discretion or judgment. 14 *Pet.*, 515. There may be a right without a remedy—there is such a·thing as prerogative—there is such a thing as immunity from suit. The case of *Reeside*, (11 *Howard*,) shows that even a set-off against the United States will not be allowed. You are not to presume that every sovereignty has the means to pay its debts, or that it would be willing so to do. You are not to assume that the legislature will not perform its duty, but whatever the injury may be, this court cannot usurp the power and attempt to coerce an officer of a co-ordinate branch of the government to perform his duty.

The power of the legislature over the treasure of the State, is an essential, vital, prerogative, inherent in all republican institutions. 3 *Story's Com. on the Cons.*, sec. 1340. *1st sec.*, *6th art.*, says the Comptroller shall receive an annual salary of $2500. This is not an appropriation of that amount by law to him for his salary. The organic law cannot operate as an appropriation under a republican government.

But again we say the salary commences only from the time of actual qualification. *Art.* 10, *sec.* 8. By the terms of this section, the old Treasurer was in office until both qualified, and neither were in office until that qualification took place. The taking the oath prescribed by the constitution, does not put him in office—he was only in when the oath and bond were taken and given as required by the act of 1852, *ch.* 12. This case is distinguished from the case of appointments under the general government, where the commis-

Thomas *vs.* Owens.

sion is the appointment itself. 2 *Kent. Com.*, 259; although they do not take the oaths, their acts are valid, and if nothing more had been required than the taking of the oath, there might be a question that his salary commenced from the day of his election. But here he was required to give bond also. In the case of collectors under the United States, there is an express act of Congress, that they may delay giving bond for three months after entering upon the duties of his office. *Gordon's Digest*, 345. Salary is a compensation commensurate with service. The constitution never contemplated the idea that two officers should be in office at the same time, and receiving at the same time the salaries of the same office. Though such may have been the practice of the general government, yet it furnishes no rule for us. There is no parallel in the provisions in reference to the judges; for their term is defined to be for *ten years*. The proper construction of the term "yearly salary of $2500," is, that the officer is to be compensated at *the rate* of $2500 per year. We insist therefore:

1st. The Treasurer of the western shore, appointed under the old constitution, combined in his office the functions of the present Comptroller and Treasurer, and retained all his official power, until both the Comptroller and new Treasurer *qualified;* until which qualification the Comptroller could not be deemed to be in office, and therefore could not have his salary commence. The oath by the constitution prescribed for the Comptroller as an officer elected, need not have been taken immediately on election, and did not, when taken, avail as a "*qualification.*"

2nd. The commission prescribed by the constitution to be issued to the Comptroller, confers on him no authority and founds no rights, but is merely a certificate of his election.

3rd. The Treasurer has no power to pay out any moneys of the State, unless under the legislature's specific appropriation. Such is the provision of the constitution, and would be the restriction on that officer if the provision had not existed. The legislature is necessarily the peculiar guardian of the State's treasury, and alone must dispose of its funds.

4th. The legislature *is the government, administering the constitution.* The office of the constitution is, to lay down *the objects* and *the principles* for legislation. A constitution is not an enactment executing itself, or operating as an act of legislation, unless where the provisions, from their very nature, are independent of legislation *to carry them out,* and are in themselves a rule of action, or a limitation of right, to the citizen. The constitution cannot operate, therefore, *as an appropriation bill;* and in fixing salaries, it but gives *power to the legislature to pay them as the legislature may direct and regulate, and as the means of the State, to be ascertained or recognised by the legislature, may allow.* The Treasurer is necessarily but the mere agent *of the legislature,* as his administrative superior, and as the only active sovereignty of the State. The different branches of the government, legislative, and judicial, and executive, being constitutionally, and, under republican organization, necessarily, distinct, each is in its sphere supreme and uncontrollable by the other, save only where the action of either the legislature or executive department violates the constitution, and is made then a subject for the judiciary's intervention. The judiciary is incompetent to supply the omissions or quicken the action of the legislative authority, and cannot do the justice which it is the *constitutional province of the legislature to render,* whether by general or special legislative action. *The constitution is directory to the legislature.* There is no judicial redress where the duty thus enjoined is neglected by the legislature, or even wilfully disregarded and slighted. The judicial power, in other words, is not suppletory to the legislative under our constitution, or under any republican system.

*Reverdy Johnson* for the appellant, in reply.

There are three questions involved in the case, and it is important that an opinion should be pronounced upon them all: 1st. What is the time from which the salary of the Comptroller is to date? 2nd. Is he entitled to be paid in the absence of

an appropriation by the legislature for that purpose. 3rd. Whether the remedy is by *mandamus?*

The Comptroller was elected 5th of November 1851; his commission issued on the 8th of December 1851. He took the oath required by the constitution, on the 10th of December 1851. He took the additional oath and gave bond, as required by the act of 1852, ch. 12, on the 19th of February 1852.

The petition states his election, his *qualification*, that he entered upon the duties of his office, and continued therein until the 20th of April 1853, that he is entitled to his salary under the *constitution*, and the drawing of the warrant for his salary then due. The petition shows the *entire* case—and if he is not entitled to relief it is because he has no case, not because there is any defect in the petition itself. The answer does not take issue upon the ground that there is no funds in hand, but upon the ground that the salary begins to run from the 19th of February 1852.

Now from what time is he entitled to the salary? This depends upon the true construction of the constitution in that particular. *Art.* 6 organises the treasury department. The great practical difficulty was, that under the old constitution there was no check upon the Treasurer. It was thought proper to divide the department, in order that the two officers might be a check, each upon the other. By the 10th sec. of art. 10, it was to go into effect on the 4th of July 1851, and on that day supersede the old constitution. In the general the old constitution was to become extinct on that day. The treasury department would have been out of existence then, except for the provision continuing the officers in office. Under these two provisions alone, (art. 6, and 10th sec. 10th art.,) there would have been no treasury department at all after the 4th of July, unless the new treasury *department* was to come into existence soon thereafter. The point of time from which the salary of both Comptroller and Treasurer commences, we contend, is the election of the former and the appointment of the latter. By *art.* 6, *sec.* 1, the Comptroller is to be chosen

at a particular time, and to have an *annual* salary of $2500; not a salary for the time he may serve, but from the time of the election, that being the only time mentioned in that connection. The same provision is made in reference to the Treasurer; he is to receive $2500 from the time of his appointment, that being the time mentioned in the clause specifying his appointment. The construction, on the other side, would require the interpolation of the words, "from the time he qualified," into the clause. The *Comptroller* is to be elected at each election of the members of the House of Delegates; this is made certain by the *4th and 5th secs. of art. 3.* The first election of delegates was to take place on the 1st Wednesday of November 1851, and they were to serve for two years. Hence it necessarily follows, that the Comptroller's term of service is to be two years. And it is just as if the constitution had said that the *Comptroller* should be elected to serve for two years from the day of his election. It is impossible that I can be wrong in this. The judge below admits that the judges of this court are entitled to their pay for the ten years, without reference to qualification, and that the same is true in reference to the *future* elections of Comptrollers, but does not admit that it applies to the first election. The same section of 6th article provides for a vacancy occurring by death, or some positive act on the part of the incumbent. The inference from this is, that the officer who does accept and qualify is in office from his election, because it contemplates that there shall be no vacancy. *Marbury vs. Madison,* 1 *Cranch.,* 274. If a party refuses to accept, there is a *vacancy* in that office, and the successor is appointed to the vacancy occurring by reason of such refusal to accept. Now if Governor Thomas had died or refused to accept, the appointing power would have filled *such* vacancy by appointment. Such vacancy would have been filled, not upon the ground that there never had been a Comptroller, but upon the ground that the office had been once filled and the vacancy had occurred therein. There is no difference between the term *chosen,* as used in reference to the Comp-

troller, and *election*, as used in reference to the judges. This provision, in reference to a vacancy, has nothing to do with the time when the first Comptroller was to be in office—there was no person to hold the office then, for there was no such office in existence. Who was to continue till he should qualify? But it was necessary, in case of a vacancy, that the appointee should hold until the qualification of his successor, because without such provision the appointee's term would have expired with the election of a new officer, and the office would then have been vacant. But in reference to the Comptroller elected, there is no provision for his holding over until the qualification of his successor; he necessarily goes out at the termination of the period for which he was elected. There is a different provision in relation to the lottery commissioner and *state librarian;* they are expressly elected to hold until their *successors are duly qualified.* So with state's attornies. When the convention intended an officer to come into office subsequent to the day he was elected, they provide for it as in the case of the *commissioner of the land office. Sec. 6, art. 7.* So with the *governor,* in *art. 2, sec. 1.* So with all civil officers, in *art. 3, sec. 14.* But it is said on the other side, that the *Comptroller* was only in office from the time he took the oath and gave the bond, as prescribed by the act of 1852, ch. 12. By the 4th sec. of art. 1, every officer is required to take an oath *before* he shall enter upon the duties of the office. One would infer from this, that when he did take it he was entitled to enter upon those duties. But it is said, the Comptroller is required to take such other oaths and enter into such bonds as the legislature shall prescribe. The legislature is not required, in terms, to prescribe any new oath or bond; they may have thought none necessary. This act of 1852, ch. 12, may be repealed, and then the old machinery would come back, according to the theory of the other side. The *8th sec. of the* 10*th art.,* it is said, is against our views, and this is the section relied upon by the judge below. The practice of the general government, where there is an *officer* absent and another acting in his place, is for *both to receive*

salaries.  The salary goes on—absence or sickness does not forfeit salary.  If he never performs the duties of his office he is still entitled to his salary.  This goes upon the general principle, that it would be unjust in the *general* to require this inquiry into conduct; the government leaves it to the discretion of each individual.  This practice prevails, because the officer appointed is in from the time of his appointment.  Whenever, therefore, the Comptroller and Treasurer qualified, the qualification of each, so far as salary is concerned, relates back to his election or appointment, even conceding that the *Comptroller and Treasurer*, conjointly, succeeded the old Treasurer.  But such a construction is not the true one. These two officers do not, conjointly, succeed the old officer. The Comptroller is *elected;*—the Treasurer is appointed by the legislature.  Now suppose the Treasurer will not take the oath or cannot give the bond, and that the Comptroller has done all he was required to do, is he to be kept out of his salary by the act of another, over which he has no control? The proper construction is, that the old Treasurer is in office *as Treasurer* until the new Treasurer is appointed, and if the Comptroller is elected, he exercises the same check over him that he would have over the new one if appointed.  But he is expressly prohibited from taking any fees or accepting any other office—compelled to come to Annapolis—and yet, because some other officer over whom he has no control has not taken the oath and given the bond, he is not to get his salary. The legislature cannot interfere with the tenure and term of office, or the day of *election*.  *Sec.* 6, *art.* 10.  Any construction, therefore, which would give to the legislature the power to interfere with the term of office must be erroneous. That the legislature took a different view of the time of the commencement of the salary of the Comptroller from that contended for on the other side, is evident from the act of 1852, ch. 119.  They did not prescribe the oath or require the bond until the 13th of February 1852, yet, on the 30th of March, they made an appropriation for a salary of $2500 from the 1st of January preceding.  The words, *"so much thereof as may*

*be necessary*," have no reference to such a case as this. This act was passed with a view to provide for all *contingent, though estimated,* expenses; if the estimate should turn out short of the appropriation, the whole appropriation was not to be paid, and to such a case as this and not to the case of salaries, which are fixed and due under the constitution, these words have reference. In the absence of any constitutional provision, an officer in for a particular period goes out when the period expires. 2 *G. & J.,* 278.

2nd. There is, in *point of fact, an appropriation from the 1st of January* 1852 *to the 1st of January* 1853. The legislature considered the appropriation of 1852 exhausted, because they, this year, have appropriated $2500 for the salary of the Comptroller, from the *1st of January* 1853 to the 1st of January 1854. So far, therefore, as our right to the salary from the 1st of January 1852 is concerned, it does not lie in the mouth of the Treasurer to say that there is no appropriation. But there is no necessity for an appropriation at all. This is an important question and one of great interest. Before the act of 1843, money was paid out of the treasury without any specific appropriation. That act was passed, but did not affect the practice in reference to salaried officers, because the constitution itself specified the particular sums due to each. The object of such a clause is to take the disbursement out of the control of the executive. 3 *Story's Com. on Cons., secs.* 1340, 1342. That object is not furthered by the construction put upon this clause by the other side. That it was not the design that the legislature should be able to stop the wheels of government by refusing to appropriate, is manifest from the fact that the constitution *fixes* the salary. *What* is the practical object the constitution had in view in thus fixing the salaries? It was to render the judges and other officers independent; this will be practically defeated if the legislature have the power to pay or refuse to pay. But it is not only fixed, but the constitution says they "*shall receive*" so much, which *shall not be diminished.* But do they not diminish if they pay but part? When the *con-*

*stitution* says that the judges *shall receive* so much every year, it means that they shall receive it from the treasury. Is not this an appropriation? What is an appropriation—it is not setting apart a particular heap of dollars for each officer. The only question is, what is an appropriation within the meaning of *sec.* 20 *of art.* 3? The appropriation for salaried officers was not thought necessary by the *committee on finance*, it was not in the original draft of the appropriation bill, and was only put in from abundant caution.

3rd. Is the *mandamus* the remedy? The Treasurer is nothing more nor less than *a paymaster*, bound to pay upon the order of his superior, the Comptroller. The respective powers of these two officers are defined in *art.* 6. The one is elected by the people, the other by the legislature: because the people would have more confidence in an officer elected by them, they have given almost all the power to him—he is to adjust, settle and preserve all accounts. This takes the question of all accounts between debtor and creditors of the State from the treasurer. The vouchers are all placed in the office of the Comptroller. He is to adjust the account between the claimant and the State when the State is debtor; between the State and the debtor when the State is the creditor. He is to grant all warrants for the payment of money, &c. The Treasurer is only to keep the moneys of the State. He *shall* receive and disburse the same upon warrants drawn by the Comptroller, and *not otherwise*—he has no discretion—he cannot go behind the warrant. The adjustment by the Comptroller, so far as the Treasurer is concerned, is final and conclusive upon the latter. He cannot even receive without the authority of the *Comptroller.* The obligation to receive upon the warrant of the Comptroller is identical with the obligation to pay; the power to dispute the one involves the power to dispute the other. How does the Treasurer, officially, know that the Comptroller took the oath of office on a particular day? The voucher of this, if it be a voucher, is in the office of the *Comptroller*, and the Treasurer has no business with it. The decision of the Comptroller is final upon

him. *Mandamus* is the proper remedy where there is no *right* in the officer to judge or to exercise his discretion. The *right* to judge and actual judging are quite different things. There was actual judging in the case of *Stockton and Stokes, vs. Kendall,* 12 *Pet.,* 625, 640, yet the Supreme court said *mandamus* was the remedy. *Marbury vs. Madison,* 1 *Cranch.,* 161, asserts the true doctrine on this subject. The *nature of the thing to be done,* and not the office held by the officer, is the test whether a *mandamus* shall lie or not. The case in 14 *Pet.,* and the other cases cited on the other side, all establish, that *Marbury vs. Madison* and *Stockton and Stokes* were law, but refused the *mandamus,* because the officer in those cases had *the right* to judge and exercise his discretion. So at last we come back to the question, whether the Treasurer had the right to judge in this case?—whether he can go behind the warrant of the Comptroller? This, we have demonstrated, he cannot do.

ECCLESTON, J., concurred with the majority of the court in the affirmance of the order, but dissented upon one point, upon which he delivered the following dissenting opinion:

I concur with the majority of the court in their *conclusions,* except in reference to the period at which the salary of the Comptroller commenced. According to my construction of the constitution, he was not qualified to perform the duties of the office, until he took the oath and gave the bond prescribed by the act of 1852, ch. 12.

Believing, as I do, that salary is given as compensation for services, I cannot understand how an officer can be entitled to salary for any period of time, during which he could not legitimately perform his official duties.

There can be no doubt that the convention intended this officer should give bond. And if so, the provision was designed to protect the State against official misconduct. Simply taking the oath prescribed in the 4th sec. of the 1st art. of the constitution, it is manifest, was not deemed sufficient to afford the necessary protection. For after requiring all

officers to take the oath just mentioned, it is provided in the 1st sec. of the 6th art., that the Comptroller shall take such oath and give such bond as the legislature shall prescribe. After making this provision for the security of the State, how can it be supposed the convention did not intend to require a full compliance with the act of the legislature, before the duties of the office could be assumed? If the bond be necessary for any portion of time during the performance of official duty, it must be equally necessary during the whole term of office; if the protection of the State against misconduct of the officer is the object to be attained.

Suppose that subsequent to the act of the legislature the Comptroller had refused to comply with its provisions, insisting that he was already in office, and would perform its duties and demand his salary, upon the ground that he had taken the oath directed in the 1st article, could it be successfully maintained that he had the right to do so? I think not. If not, then why? It could only be for the reason that he was not qualified. And yet, in the supposed case, every requisite to constitute him Comptroller would exist, except a compliance with the legislative act.

There was no necessity for permitting the officer to enter upon his duties before the action of the legislature, for the 8th sec. of the 10th art. provides, that the officers holding commissions under the old constitution, should continue to hold and exercise their offices, according to their existing tenure, until they should be superseded pursuant to the new constitution, and until their successors should be *duly qualified.* Under this provision the Treasurer was authorised to continue, and in fact did continue, to perform the duties of the treasury department, until after the passage of the act in reference to the qualification of the Treasurer and Comptroller.

The authority of the legislature to pass such a law, and the imperative obligation of the officer to comply with its terms, are to be found in the 6th article of the constitution. And, in my judgment, not only did that instrument give authority to the legislature to act in the premises, but when, in relation

to that important branch of the government, the treasury department, it declared that the Comptroller "shall take such oath and enter into such bond, for the faithful discharge of his duties, as the legislature shall prescribe," it imposed a duty upon the legislature to pass a law on the subject. When passed under such express requirement of the constitution, compliance with the provisions of the act became as necessary preliminary steps in the qualification of the Comptroller, as if the same provisions had been set forth in the constitution itself.

It will avail nothing to say that the construction here contended for, would authorise the legislature, by refusing to act, virtually to nullify an election by the people and to repeal the constitution, in regard to the office of Comptroller. In every constitution there must be trusts or powers confided to the different branches of the government; a failure or refusal to perform which, would render nugatory and void some of the most important provisions of the organic law, and deprive individuals of valuable rights, for which there can be no relief, except through the ballot box, by removing the delinquent officers. Notwithstanding such inconveniences may result from the necessary imperfection of all human affairs, yet when the creation of rights, or the completion of those which are imperfect, depends upon legislative enactments, such rights are not created or perfected, in consequence of the failure to act. If the possibility of neglect to execute, or of a corrupt execution of, a power, is a sound argument against its existence, then there are no constitutional powers, for any of them may be neglected or corruptly executed.

Suppose a vacancy in the office of Treasurer, occasioned by death, during the session of the legislature. Now, if they should neglect or refuse to appoint a successor, and after their adjournment the governor should decline filling the vacancy, the treasury department would be in quite as bad a predicament, as it would be placed by the construction for which I have been contending, even if the legislature had refused to pass any law in regard to the oath and bond of the Comp-

troller, and yet I presume it will not be said that the legislature and governor have no power of appointment under the supposed circumstances.

Le Grand, C. J., delivered the opinion of this court.

This is an appeal from an order of the circuit court for Anne Arundel county, refusing to grant a writ of *mandamus* to be directed to the appellee, commanding him to pay the amount of a draft drawn upon him by the late Comptroller of the State treasury.

The petition of the applicant stated, that he was duly elected Comptroller of the treasury on the 5th day of November 1851, and, that after having qualified, according to the constitution and laws of this State, he entered upon the discharge of the duties of the office, and continued therein until the 20th day of April 1853: that on the 15th day of April, he issued a warrant on the appellee, who was then, (and who is still,) the Treasurer of the State, for the sum of $1111.11, "in payment of so much salary due him as Comptroller of the treasury department, to be paid pursuant to the provisions of the constitution, and also pursuant to chapter — of 1853:" that he caused payment of said warrant to be demanded of the Treasurer, and that he refused to pay the same.

To this petition the appellee answered, objecting to the issue on several grounds, which are in substance as follows:

1st. That as Treasurer of the State of Maryland, he is not liable to the supervision or control of the circuit court in the manner prayed for in the petition.

2nd. That no sufficient appropriation has been made by *law*, specifying a sum applicable to the payment of the amount claimed by the petitioner.

3rd. That the petitioner did not qualify as Comptroller, according to the constitution and laws of this State, until the 24th day of February, in the year 1852, and remained in office until the 20th April 1853: that he has been paid out of the treasury of the State for his services as Comptroller the sum of $2595.83.

There were other objections interposed, but they are all resolvable into those which we have given.

The difference between the Treasurer and the late Comptroller in regard to the *amount* of the claim of the latter, consists in this: The Treasurer is of opinion he is only entitled to be paid from the 24th day of February, while the late Comptroller holds, that he is entitled to be paid from the day of his election, the 5th of November 1851.

We agree with neither of these opinions.

The 1st section of the 6th article of the constitution, provides for the establishment of a treasury department, "*consisting* of a Comptroller, chosen by the qualified electors of the State, at each election of members of the House of Delegates, who *shall receive* an annual salary of two thousand, five hundred dollars; and of a Treasurer, to be appointed by the two houses of the legislature, at each session thereof, on joint ballot, who *shall receive* an annual salary of two thousand, five hundred dollars."

The 4th section of the 3rd article declares, that "the members of the House of Delegates shall be elected by the qualified voters of the counties and the city of Baltimore respectively, *to serve for two years from the day of their election.*"

It has been contended on the part of the appellant, that these two sections ought to be considered together, and that they fix the *term* of service of the *Comptroller* at two years *from* the day of his election. This, in our judgment, does not necessarily follow from the language of either or both. The 1st section of the 6th article merely provides, that the Comptroller shall be "*chosen*" at each election of members of the House of Delegates, and not, as in the case of the delegates, that he "*shall serve* for two years from the day of the election.*"

There are other clauses in the constitution which have an important bearing on the true interpretation of the language of the constitution in regard to the Comptroller. The *time is specified* from which the Executive, the Judges of the Court of Appeals, District Attorneys, Lottery Commissioner, and other officers, are to hold. And the 4th section of the 1st article of

the constitution provides, "that *every* person elected or ap-pointed to *any office* of profit or trust under the constitution or laws made pursuant thereto, *before* he shall enter upon the duties of such office, shall take and subscribe" the oath or affirmation given in the section.

Now, we hold, that the late Comptroller could not be considered as in office until he *qualified* by taking the oath prescribed by the 4th section of the 1st article. After his election and *commission* by the Governor, he had the *right* to invest himself with the powers and entitle himself to the salary, by qualifying in the manner pointed out by the constitution; but, until he *actually* did qualify, he was no more Comptroller than any other citizen; his qualification being an indispensable *prerequisite* to his investiture with the authority and responsibilities of the office.

But, it is said, that although he would not be permitted to discharge the duties of the office until his qualification, yet, when he did qualify, such qualification by operation of law, would relate back to the day of his election, and entitle him to compensation from that time. There is a *dictum* in the case of *Marbury vs. Madison,* 1 *Cranch.,* 151, which gives color to such a doctrine. It is there said, "a commission bears date, and the salary of the officer commences from his appointment, and not from the transmission or acceptance of his commission." This opinion was not necessary to the decision of the case, and, as a proposition applicable to every instance of a commissioned officer, we cannot give it our assent. We must give to the constitution under which we live a common sense interpretation, and it is clear to our minds the purpose, in this regard, of its framers, was to make no gratuities, but to pay for services actually rendered, and that no one under it is authorised to claim a salary attached to an office, until he has accepted it and qualified himself by taking the prescribed oath. In fact the constitution expressly declares, that "if any person elected or appointed to office, shall refuse or neglect to take the said oath or affirmation, he shall be considered *as having refused to accept* the said office."

The constitution provided, that the first election under it should be holden on the 5th day of November 1851; and, as it made an election of Comptroller by the electors of the *whole State* necessary, it was obvious to every one, that their choice could not be made known at the seat of government on the day it took place, and, as a necessary consequence of this, that he could not be commissioned and qualified at that time. A candidate for public favor must be aware of this, and be assumed to have agreed to accept the office which he solicits, subject to the effect of the delay incident to the ascertainment of the state of the poll and the issue of his commission; and, as a general thing, he suffers little or no diminution of salary from the circumstance, for the like delay attends the qualification of his successor, which, in most cases, prolongs his term until he is superseded by his successor's qualification. It is urged, however, that the Comptroller elected in 1851, would not be authorised to hold on until his successor qualified; that his term of service would expire on the 5th day of November 1853.   We have already said, we see nothing in the constitution which fixes his term of service at two years from the day of his election, and although it is not anywhere expressly said in the constitution, that he shall continue in his office until his successor has been duly elected, commissioned and qualified, yet, it is obvious to us, that looking to the spirit and policy of the constitution, as manifested in its provisions affecting the other officers of the government, in regard to whom it is provided, they shall continue in office until superseded by their qualified successors, that it was not the design of the framers of the constitution there should be an interregnum in the office of Comptroller, and thereby suspend for the time the whole operations of the Treasury department of the State.   Such a state of things might be fraught with the most calamitous results; the dishonor, for instance, of the State's faith and credit.   And, in this view, we are strengthened by the 1st section of the 6th article, which provides, that when the Governor fills a vacancy in the office of Comp-

troller, his appointee shall "continue until another election by the people and the *qualification of the successor*."

From this it follows, we are of opinion, that the appellant was not legally the Comptroller of the treasury, nor entitled to the salary affixed to that office until he qualified, according to the requirements of the constitution, which he did, on the 10th day of December 1851.

But it is said, that inasmuch as the 1st section of the 6th article of the constitution declares, that "the Comptroller and the Treasurer shall keep their offices at the seat of government, *and shall take such oath and enter into such* bonds, for the faithful discharge of their duties, as the legislature shall prescribe;" and as the legislature did not prescribe an additional oath to that set out in the constitution, nor fix the form and penalty of the bond until the passage of the act of 1852, ch. 12, there could be no qualification within the meaning of the constitution.

If this be true, then, in the event of a vacancy occurring by death, resignation or otherwise in the office of Treasurer before the passage of the act of 1852, it would have had the effect wholly to suspend the operations of the department; for, according to the argument, no Treasurer appointed by the governor, or by the legislature on joint ballot, could have rightfully entered on the discharge of the duties of the office until after the passage of that act. All he could have done, before he could have assumed to act as Treasurer, would have been to take the oath and give the bond which the constitution and the *then existing* laws prescribed. If the 1st section of the 6th article of the constitution inhibited the late Comptroller from entering on his duties until the passage of the act of 1852, ch. 12; it equally interdicted a Treasurer, for it is, *in terms*, just as applicable to the Treasurer as it is to the Comptroller; and, therefore, if such a construction of the constitution were sanctioned, it would necessarily follow, that a Treasurer appointed prior to the act of 1852, from the time he assumed to act as such until he gave the bond and took the oath prescribed by that act, would have acted ille-

gally and in defiance of the requirements of the constitution, and as a consequence, all his acts would have been void as being without warrant of law; in other words, the whole operations of the government would have been stopped.

The truth is, there is no force in the argument. In adopting the constitution, the people designed to secure to themselves all the safeguards which that instrument was intended to cast around their liberties and property; and prominent among these was the supervisory and controlling power of a Comptroller of the treasury department. The instrument provided for his election, commission and qualification, and when these took place he was constitutionally inducted into office.

The authority given in the 1st section of the 6th article to the legislature, to prescribe an oath and to require a bond other than those fixed by the constitution and existing laws, was placed there to guard against consequences which would have resulted from the operation of a well known and universally acknowledged principle of law.

Where a constitution defines the qualification of an officer, it is not within the power of the legislature to change or superadd to it, *unless the power be expressly, or by necessary implication, given to it;* and hence, the framers of the constitution, in the indulgence of an enlightened foresight, empowered the legislature to make such additional exactions of the Treasurer and Comptroller, in the way of bond or oath, as in its judgment, from time to time, the safety or exigencies of the State might require. Under this grant of power, it is competent to the legislature, *at any time,* to alter the oath or bond prescribed by the act of 1852.

Now, we understood the counsel for the Treasurer to concede, that the late Comptroller was properly in office so soon as he had complied with the requirements of the act. And yet, if their argument in regard to that act be valid, it follows, as an irresistible consequence, that both the Treasurer and Comptroller, although properly inducted into office, would have all their acts rendered illegal and void by a *subsequent* exercise of legislative power, for it must be borne in mind,

that the exercise of the power is not confined to its first exertion by the legislature, *but extends to all time.*

It is obvious the grant of power was made for the reason which we have given; and that all that was required of persons elected to the offices of Comptroller and Treasurer was to qualify according to *existing laws*, liable, however, to any demand the legislature might thereafter make on them; and on their failure to comply therewith, to be deemed as having resigned their offices.

The next question for our consideration is, whether there was an appropriation, and if so, to what extent?

The Treasurer insists that he is alone responsible to the legislature, and that the late Comptroller is only to be paid from the 24th of February 1852, the day on which he gave the bond and took the oath prescribed by the act of the session of 1852.

The legislature took a different view of the matter, for they, by act of 1852, ch. 119, directed the payment of salary to the Comptroller from the first of January of that year, and at their last session, in passing the general appropriation act, did so, as is to be plainly gathered from it, on the hypothesis, that the $2500 which had been appropriated by the act of the preceding session for the salary of the Comptroller had been exhausted, and, therefore, voted another $2500 for his salary from the 1st day of January 1853 to the 1st day of January 1854. It is clear, therefore, if a *legislative* appropriation be necessary to justify the Treasurer in paying the salary of the Comptroller, such appropriation was made from the 1st day of January 1852; and consequently on this head there is no force in the objection, except in so far as the period antecedent to the 1st of January 1852 is concerned. For the period subsequent to that time, the appropriation and the direction to pay it are undeniably adequate and *specific.*

The inquiry then is, is there an appropriation for the period intervening between the 10th of December 1851—the time from which we think he is entitled to pay—and the 1st day of January 1852?

Thomas *vs.* Owens.

We are of opinion the constitution, *proprio vigore*, makes such appropriation.

Under our system of government its powers are wisely distributed to different departments; each and all are subordinate to the constitution, which creates and defines their limits; whatever it commands is the supreme and uncontrollable law of the land.

This is not denied *directly*, although it is inferentially, substantially and *practically*. It is said, that inasmuch as the 20th section of the 3rd article of the constitution declares, "No money shall be drawn from the Treasury of the State, except in accordance with an appropriation made *by law;*" that an *act of Assembly* must precede the withdrawal, and inasmuch as none such has been passed covering the period antecedent to the 1st of January 1852, there is, therefore, no appropriation *by law* for that time. To this reasoning we cannot yield our consent.

In the construction of any instrument the whole paper ought to be considered, that the will of its framers may be truly and accurately ascertained; the objects contemplated and the purposes to be subserved should be constantly kept in view, and the language used interpreted in reference to the manifest intent.

Now what could have been the purpose of the clause in the constitution to which we have referred? It was obviously inserted to prevent the expenditure of the people's treasure *without their consent*, either as expressed by themselves in the organic law, or by their representatives in constitutional acts of legislation. To use the language of Justice Story, (3 *Vol. Com. on Con.*, sec., 1342,) its purpose "is to secure *regularity, punctuality* and *fidelity* in the disbursements of the public money;" and, as said by Judge Tucker, in his commentaries, (1 *Tucker's Blac., Appendix*, 362,) "All the expenses of government being paid by the people, it is the right of the *people*, not only not to be taxed without their *own consent*, or that of their representatives freely chosen, but also to be actually *consulted* upon the disposal of the money."

29     v.4

Such a provision, says the same learned writer, "forms a salutary check, not only upon the extravagance and profusion in which the executive department might indulge itself, and its adherents and dependents; but also against any misappropriation which a rapacious, ambitious or otherwise unfaithful executive might be disposed to make. In those governments where the people are taxed by the executive, no such check can be interposed. The prince levies whatever sums he thinks proper; disposes of them as he thinks proper; and would deem it sedition against him and his government if any account were required of him, in what manner he had disposed of any part of them. Such is the difference between governments where there is responsibility and where there is none."

These being the purposes and objects of the clause, the question is:—*Have the people given their consent to the payment of the salary of the Comptroller?* That they have done so is palpably manifest. They have said he "shall receive an annual salary of two thousand, five hundred dollars." They have not merely said he may *claim* such a sum, but, emphatically, that he "shall *receive*" it. It is impossible for human language to be less ambiguous or more positive. The people, in their *organic* law,—which is paramount to all other law—have not only given their *consent*, but they have imperatively issued their commands that the particular officer "*shall receive*" it. How is their will obeyed if it be within the power of the Treasurer, or any one else, to withhold it from caprice, unfaithfulness to duty, or from mistaken judgment? To allow of such a power in that officer would be to put him above the constitution, whose creature he is. It would be to invest him with authority to annul the sovereign will; in fact, to stop the wheels of government and reduce things into the wildest confusion. The constitution has said the officer "*shall receive*" his salary, and this *fiat* of the supreme will is not to be nullified by the mere *ipse dixit* of a mere *ministerial* officer, for such, and none other, is the Treasurer.

In assigning the powers of government to three different departments, the constitution intended to secure to each its independency of action, and the more certainly and effectually to ensure this, *it* has ascertained and appropriated the salary they are severally to *receive;* and it has inhibited the legislature from *diminishing* it. Were it not for such a provision, the whole government would exist only by the permission of the legislature. It can only be carried on through the instrumentality of individuals, and their services can only be obtained by being paid for. The framers of the constitution, and the people who adopted it, aware of this, determined not to submit the durability of their work to the caprice, passion or prejudice, which possibly might, at times of great excitement, triumphantly rule the action of the legislature; and, therefore, wisely did the work themselves by engrafting in the organic law a provision for the protection of those who should be charged with its execution; in other words, *they* made the appropriation.

An opposite interpretation would countenance this paradox, that a co-ordinate branch of the government could stop its whole machinery, by refusing to pay the salaries of those upon whom is devolved the discharge of the duties of the other branches; and this too when the constitution *expressly* declares that these officers *"shall receive"* their salaries, and that they *"shall not be diminished."* "It would be giving to the legislature a practical and real omnipotence, with the same breath which professes to restrict their powers within narrow limits. It is prescribing limits, and declaring that those limits may be passed at pleasure." 1 *Cranch.*, 178.

Now, it is presumed, it would not be contended by any one, however hazardous, that if the legislature were to pass an act *diminishing* the salary of the governor, or of any other officer whose salary is fixed by the constitution, that such an exercise of power would be rightful and constitutional. If it be not competent to the legislature to take away *a part*, by what process of reasoning can it be maintained that they can take away the *whole?* And yet this is the extent to which

the argument addressed to us goes. It seems to us to be but necessary to state the proposition, to cause its instantaneous rejection.

We hold, for the reasons we have assigned, the people have given their *consent* to the payment of the salaries fixed in the constitution, by declaring the amount *"shall"* be *"received"* by the particular officer; and that this is an appropriation by *law*—by the *supreme law* of the State.

The next inquiry for our determination is, whether the remedy invoked is properly applicable to a case like this?

We have already stated we do not think the petitioner is entitled to his salary from the day of his election; but as the question in regard to remedy is one of great practical importance, we deem it proper to express our opinion in regard to it. And this necessarily involves an inquiry into the relative powers of the Comptroller and Treasurer, as defined by the constitution.

The 3rd section of article 6th, defines the principal duties of the Treasurer as follows: he "shall receive and keep the moneys of the State, and *disburse* the same *upon warrants drawn by the Comptroller*, and *not otherwise;* he shall take receipts for all moneys paid by him, and all receipts for money received by him shall be endorsed upon warrants signed by the Comptroller, without which. warrant, so signed, no acknowledgment of money received into the Treasury shall be valid."

The 2nd section of the same article provides, "the Comptroller shall have the general superintendence of the fiscal affairs of the State," and "superintend and enforce the collection of all taxes and revenue; *adjust, settle* and preserve all public accounts," &c.

From these two sections it appears:—1st, that it is the duty of the Treasurer to *disburse* the public moneys on the *warrant of the Comptroller*, and *not otherwise;* and 2nd, that the duty of *adjusting* and *settling* all public accounts is imposed upon the Comptroller.

Looking to these provisions of the constitution, it appears

to us, that the power of *adjusting* and *settling* public accounts is *exclusively* conferred on the Comptroller, and, in this particular, it is the duty of the Treasurer to respect such adjustment and settlement, and on warrant of the Comptroller to pay the amount; a duty subject only to these reservations: 1st, that the warrant must be in proper form; 2nd, that there must be an appropriation by law; and 3rd, that there must be funds in the treasury to meet the demand. He has nothing to do with the *elements* of accounts. If there be an appropriation by law, it is the duty of the Comptroller to ascertain the *amount*. The Treasurer is not required to *preserve* accounts, that duty is imposed on the Comptroller.

The Comptroller is chosen *immediately* by the people; the Treasurer by their representatives; and the former have deemed it advisable to entrust the officer of their *own choice* with duties formerly performed by the executive and Treasurer. With the wisdom or imprudence of this disposition we have no concern, except as citizens of the State. The sovereign will has thought proper to endow a particular officer with certain delicate and highly important functions, confiding in the security which his official bond, private and public character, and the responsibilities of his oath, afford. As human government cannot be carried on without reposing confidence somewhere, all human ingenuity can suggest as guards against faithlessness, ignorance, or corruption in office, are those which have been thrown round the Comptroller. His case constitutes no exception to the rules applicable to other officers to whom is confided public trusts: in regard to him, the same risks must be incurred as are encountered in regard to the Treasurer and other officers. Confidence, arising out of the history of past life, is, after all, what is most generally viewed as furnishing the surest guaranty of future fidelity. But, be this as it may, the people have conferred the power, and so long as it be rightfully exercised, it is controlling.

We have said there is an appropriation, and that the petitioner is entitled to be paid from the 10th day of December

1852, the day on which he qualified; and in such a case, if payment be refused, *mandamus* is the proper remedy.

When there is an appropriation, and a proper warrant drawn by the Comptroller and presented to the Treasurer, his duty is purely *ministerial:* all he has to do in such a case, is to count out the money; an act ministerial, and nothing else. If he refuse to perform it, the law will compel him, and the party injured by the delay consequent upon his delinquency, may sue his official bond, or bring a special action on the case. It is the pride and boast of our political institutions, that no man is above or irresponsible to the law; and, to use the language of Chief Justice Marshall, (1 *Cranch.*, 177,) "It is emphatically the province and duty of the judicial department to say what the law is. Those who apply the rule to particular cases, must of necessity expound that rule. If two laws conflict with each other, the courts must decide on the operation of each. So if a law be in opposition to the constitution; if both the law and the constitution apply to a particular case, so that the court must decide that case conformably to. the law, disregarding the constitution, or conformably to the constitution, disregarding the law, the court must determine which of these conflicting rules govern. *This is the very essence of judicial power.*"

In the case of *Amos Kendall, Postmaster General of the United States, vs. Stokes,* 14 *Peters,* 472, it was held by the Supreme Court of the United States, that it was competent to compel the postmaster general, by *mandamus,* to do a ministerial act—in that case, the giving, on the books of the department, a credit authorised by an act of Congress. And also held, that the *mandamus* could not be considered as seeking to direct or control the postmaster general in the discharge of his official duty, partaking, in any respect, of an executive character; but to enforce the performance of a mere *ministerial* act, which neither he nor the president had any authority to deny or control. That case, in principle, is the same as would be the one in which the Treasurer of this State should refuse to comply with the requirements of the

law.   See also the case of *The King vs. The Lords Commissioners of the Treasury*, 31 *Eng. Com. Law Rep.*, 72.

Waiving all objection which might be urged to the particular form of the proceedings, we are of opinion, that the Treasurer properly refused to pay *this* warrant, because it did not show on its face the particular law under which it was drawn.   It professes to have been issued under the constitution and an act of Assembly, without designating what particular act.   For these reasons, and because the Comptroller in his petition claimed more than he was entitled to, we affirm the order of the circuit court refusing the *mandamus*.

*Order affirmed.*

Judge MASON having heard only a part of the arguments in this case, (those of Messrs. *Pratt* and *Spencer*,) consequently did not participate in the decision.   He requests the Reporter to say, that having examined the questions involved in the controversy, he fully concurs with the opinion of the majority of the court, as delivered by the Chief Justice.