### JOHN K. SAPPINGTON ADMR. OF WM. SAPPINGTON vs. MARY SCOTT.

The 18th sec. of the 4th Art. of the Constitution provides that, "there shall be a Register of Wills in each county, who shall hold his office for six years from the time of his election *and until a new election shall take place.*" HELD:

That by the true construction of this section, in connection with other clauses of the Constitution, a Register of Wills continues in office until his successor is not only *elected* but until he is *duly qualified.*

APPEAL from the Orphans Court of Harford County.

This appeal was taken from two orders passed by B. H. Hanson, Register of Wills for Harford county, in the recess of the Orphans Court.    The facts of the case are fully stated in the opinion of this court.

The cause was argued before LE GRAND, C. J., ECCLESTON, TUCK and BARTOL, J.

*Otho Scott*, for the appellant, argued that there was error in the orders appealed from:

1st. Because C. W. Billingslea was register when he passed the account on the 5th of December 1857.

2nd. Because B. H. Hanson had no authority to pass the orders passed by him, without process against the appellant to appear and answer.

On the first point:—The appellee by limiting the official term of Billingslea to the 4th of November, must do so on the theory, that on the day of the general election his office expired. But does it expire at that time?    Section 18, of Art. 4, of the Constitution, says, he shall hold for six years, *and until a new election* shall take place.    This *new election* must mean the new induction of a register, not the mere voting for one on the election day for officers generally.    A new election cannot mean the mere balloting on the election day; it must include, in its meaning, the means provided for ascertaining who is elected.    In the case of a register the election returns are sent to the Governor, and in case of a tie by the 30th sec. of Art. 4,

he is to order a new election. In case of a tie, the new election mentioned in the Constitution would be the one ordered by the Governor, not the general election. The Constitution did not mean that the public should be without a register, at every election, from the election day till the returns were made and the Governor issued a commission. The phrase, "until a new election," must mean till a successor is qualified. Any other meaning would make a vacancy from the election day till the new register was qualified, when there was no tie or contest about the election. In the case of a tie the vacancy would extend till a new election was had under the order of the Governor, or, in case of a contest, till the decision of the Legislature, which would be several months; and there is no provision for filling such a vacancy. By sec. 18, a vacancy in the register's office is to be filled by the orphans court till the next general election, when a register shall be elected. This cannot apply to a tie, where the Governor is to order a new election, or to a contest before the Legislature, but only to cases where there is no person entitled to claim the office. As is said by the court in *Thomas vs. Owens, 4 Md. Rep.,* 189, we must give the Constitution a common sense interpretation, and in doing so we must come to the conclusion that the people, in making their Constitution, never designed that there should be an interregnum in the clerk's and register's offices at every election, but that the true meaning of the phrase, "and until a new election is held," used in the 14th sec. in reference to clerks, and in the 18th sec. in reference to registers, is, that the clerk and register shall hold for six years and until a successor was commissioned and qualified. If this is not the true meaning, why were the words, "until a new election," added? If they only mean till a new officer is voted for at the general election occuring six years thereafter, they mean nothing, for the election is fixed by the Constitution and must occur at the end of six years, so that if they do not mean what we contend for, they mean this, "to hold for six years and until a new election," which must occur in six years. This would be giving no meaning to the words

"until," &c., when a construction consistent with the spirit and intention of the framers of our Constitution requires they should have the meaning we contend for   The Constitution would be very *imperfect without such meaning* is assigned to these sections.   At every election our clerk's and register's offices would be closed until the legality of the election was settled, and the new officers qualified.   No one could record a paper or obtain a copy, prove a will, or obtain letters of administration, issue a writ, or get a marriage license.   For it will be seen that the constitutional provision for filling vacancies does not apply to such cases.   When the orphans court or Circuit Court fills a vacancy the appointee holds till the next general election, when a new officer is to be elected; secs. 14 and 18 of Art. 4.   If such vacancies could be filled till the next general election, a similar vacancy would occur at the next election, and so they would be filled, from election to election, till the end of time.   The language in regard to clerks is the same, except in clerks the words *"is held"* are used instead of the words *"shall take place,"* but each have the same meaning.   If there is any difference, the words *"is held"* as used in regard to clerks, would limit the term of office more strictly than the words, *"shall take place."*   But other provisions in the Constitution would make such a construction in regard to clerks as would limit their official term to the election day, absurd.   By sec. 29, of Art. 4, the clerk is to certify the election returns of all officers to the Governor.   If the clerk is out of office on the election day who is to make the returns to the Governor? and without the returns no commission could be issued, and the whole governmental machinery would be brought to a *dead-lock;* it must appear, by reflecting on the object and intention of the Constitution, that the registers and clerks are authorised to hold till their successors are qualified. Any other construction would produce great inconvenience to the public, and this could never have been the intention of either the Convention who framed, or the people who adopted, the Constitution.

On the second point:—There was no summons for the appellant, nor was there any proper notice given.   The order on

Sappington's Admr. *vs.* Scott.

the petition was to show cause on the 29th of December, and the day previous the sheriff states he served notice on the appellant, and on the 31st Hanson passed the order *ex-parte* rescinding the account passed on the 5th. It is admitted that the orphans court may revise the accounts of any administrator, on the petition of any one interested, but the party to be charged must be summoned, and the court has no authority to act without such summons. The Act of 1849, ch. 14, gives the register all the powers of the orphans court, during the recess, with this exception; the 2nd section of the Act makes all process returnable to the regular terms of the orphans court which are stated in the Act, and the term to which the process in this case should have been returnable was the 1st Monday of February 1858, instead of the 29th of December 1857. Whether the service of the petition and order is regarded as equivalent to a summons or not, still, if so, it is process, and should have been returnable at a regular term of the orphans court. The Act of 1849, although conferring large powers on the register, designed in all cases when the parties were to be brought in by process, that it should be returnable when the court was in session. The general principle of justice is, that no one shall be condemned unheard, and no tribunal can proceed *ex-parte*, except in case where the law especially authorises it, and there is no law which authorises the orphans court to proceed *ex-parte* on petition. The law and the practice is a summons enforced by attachment, &c. Act of 1798, ch. 101, sub-ch. 15, sec. 13.

*Henry W. Archer* and *Edwin H. Webster,* for the appellee, argued:

1st. That the orders passed by Billingslea, on December 5th, 1857, were illegal, because he was not then Register of Wills, and not authorized to execute the judicial powers given to the register by the Act of 1849.

2nd. Because Hanson, the then register, had full power to pass the orders of the 24th and 31st of December. It was not an original proceeding and no process was necessary.

3rd. That the order rescinding the orders of December 5th,

was not a final order, nor conclusive upon the right of the parties. It was merely interlocutory, and no appeal will lie therefrom.

4th. That assuming that Hanson had the power to pass the order appealed from, there is nothing in the record to show that it was erroneous.

Upon the first point:—we think it is sufficient to refer to the language of the Constitution, which, in the 18th section of the 4th Article, provides, that "there shall be a Register of Wills in each county, *who shall hold his office for six years from the time of his election, and until a new election shall take place.*" Words cannot be plainer to express the meaning we contend for; there is no ambiguity in them—they are not repugnant to sound sense and reason;—there is nothing in the Constitution to show that the intention of the framers was manifestly different from what they have said in regard to the duration of the register's office; and in such case the Court of Appeals have said: "We must give it its natural and ordinary meaning." 5 *Md. Rep.*, 431, *Marshall vs. Harwood.* In that case a different question was presented, but a rule of construction was adopted which, we think, is decisive of the present case. The record has been amended, by agreement, to show (what the court would probably have taken official notice of) that Billingslea was elected on the first Wednesday of November 1851; that a new election took place, and Hanson was elected on the first Wednesday of November 1857; and that his commission was issued on the 20th of the same month;—the commission itself (a copy of which is made a part of this record) recites, that Hanson was elected on the 4th day of November, to hold said office for six years from the time of his election. How then can it be said, without doing violence to the language of the Constitution, and falsifying the commission issued to Hanson, that Billingslea was register on the 5th of December? The theory of the appellant can only be maintained by interpolating the words, "*and until his successor is qualified.*" These words are not to be found in the Constitution, in connection with the office of register,—nor any other words that are

equivalent. So in regard to members of the House of Delegates; Art. 3d, sec. 4th. And Commissioner of Public Works; Art. 7, sec. 3. And Commissioner of the Land Office; Art. 7, sec. 6. And Judges of the Court of Appeals; Art. 4, sec. 4. The Constitution provides, that they shall all hold their offices for certain definite terms, without any provision for holding until the qualification of their successors. But where the framers of the Constitution intended that the term of office should extend until the qualification of the successor, they have used apt words to express their meaning,—as in the case of justices of the peace and constables, sec. 19 of Article 4; and State's Attornies, sec. 1 of Art. 5; and Librarian, sec. 7, of Art. 7;—and the fact, that they have used different language in regard to these different offices clearly shows, that they understood and intended what they have plainly said. It is not pretended that the Constitution is, in all respects, perfect, but its framers had a right to make it as it is, and it is not for us to remodel and change it.

It is contended by the appellant, that the words, *"and until a new election shall take place,"* in the 18th sec. of Art. 4, have no meaning, unless they be construed to mean *"until a successor is elected and qualified."* This is a mistake on his part. The first Wednesday in November does not always come on the same day of the month, and the term of six years does not necessarily fill up the space between the two elections. Those words are also useful and important to provide for the case where no election shall take place, at the appointed time, as in the case of a tie, where the old register would clearly be entitled to hold until an election should, in fact, take place.

Much of the appellant's argument—perhaps the most forcible part of it—is expended to show, that the words, "until a new election," should be construed to mean, "until the result of such election is ascertained." We might safely admit this, for the result of Hanson's election was ascertained and his commission in his pocket long before the 5th of December, and such a construction would obviate every inconvenience suggested by the other side. So much of the appellant's ar-

gument as tends to establish, that the clerks of the Circuit
Courts continue in office, beyond the time when a new elec-
tion is held, has no force as applied to the case of registers.
The assignment, by the Constitution, of certain duties to the
clerk which he *must* perform, in the interval between the
election of his successor and the ascertainment of the result of
that election, may be sufficient to control the preceding lan-
guage in regard to that officer's term of service.   The two
clauses relating to the same office must, of course, be con-
strued together; and it may well be said, that the framers of
the Constitution intended that the clerks should hold until
they could perform the duty imposed by the 29th sec. of Ar-
ticle 4th.   But such construction is not by force of the lan-
guage used in the 14th section, nor could it be given to the
words there used, standing alone.   Wherever, *"ex necessitate
rei,"* a different meaning is given to the words from that
which they plainly import, it must be limited to the cases
where the necessity exists, and extend no further than the ne-
cessities of the case require.   But in regard to the registers
there is no such necessity for their holding over for the short
interval between the election and qualification of their suc-
cessors, as will justify a judicial amendment of the Constitu-
tion or a violation of its language, nor is there any controlling
clause (like the 29th section, in regard to the clerks) to show,
that more was meant by the 18th section than its words ex-
press.   And although it may be permissible, under the cir-
cumstances, to extend the time of the clerks, to enable them
to perform the purely ministerial duty required by section 29,
it furnishes no argument for extending the tenures of ex-re-
gisters and clothing them with all the judicial powers of the
orphans court, after their term of office, as fixed by the Con-
stitution, has expired.   In the case of *Thomas vs. Owens*,
4 *Md. Rep.*, 219, 221, the court say, that the Comptroller
holds his office until his successor is qualified, although it is
not expressly so provided in the Constitution.   But they put
it upon the ground, that his term of service *is not definitely
fixed by the Constitution*, and that the 1st sec. of Article 6,
extends the office of Comptroller, by implication, until his

Sappington's Admr. *vs.* Scott.

successor is qualified, and the court carefully marks the distinction between such cases and those in which the time is specified.

We repeat, that there is no actual necessity for the register's office to be open every day or every week in the year, and it may well be doubted, whether his judicial powers might not be dispensed with altogether. The most that can be urged against closing his office for the few days intervening between the election and the qualification of his successor is, that some little inconvenience might arise, but there is a marked distinction between a case of necessity and one of mere convenience; and as was well said by Judge Brewer, in 5 *Md. Rep.*, 425, "The court cannot, by a forced construction, remedy an inconvenience or supply a *casus omissus* in the Constitution." If there should be any vacancy which ought to be filled before a successor can be qualified, ample provision for such case is made by the Constitution.

Upon the 2nd point the appellant's argument is, that upon the petition of the appellee in the orphans court, process was necessary, which, by the Act of 1849, ch. 14, should have issued, and been made returnable to the next regular session of the orphans court. This the appellee denies. She contends that the petition was nothing more in substance and effect than a motion to strike out the orders referred to, on the ground of surprise, irregularity, &c. The form of the motion is immaterial; it might have been made orally, by simply asking upon sufficient grounds that the orders be stricken out. The Act does not say, that process shall issue upon every motion that may be made and every petition filed, but only, that *when process does issue*, it shall be returnable to a regular session of the court. In this case no process was issued or directed. The first order passed thereon was simply, that the matter should stand for a hearing on a certain day. It was of course proper, that notice should be given to the appellant; and the record shows that notice was given, by service of a copy of the petition and order,—and the case was postponed from day to day, to afford him an opportunity of showing cause; but this was not a proceeding in which the appellant

was to be brought into court. It was defensive action in a case already before the court, in which the appellant was actor.

There was sufficient reason why the appellee's motion, to strike out the orders should be acted upon before the next session of the court. No appeal would lie from a refusal to strike out, and if the motion had not prevailed, it would then have been too late to appeal from the obnoxious orders. And if it be asked, why not have appealed at once, instead of moving to strike out? We say, because the record would not have fairly and fully presented the points upon which we relied, and a formal motion in writing appeared to be necessary. There were, moreover, some matters which could only be noticed by the court below, as for instance, the allowance of $3809, commissions to the administrator, after having allowed large fees to the administrator's attorney for doing the work, and the item, No. 43, in the account, for $5,695.47, would have appeared correct upon the appeal, although the court below was satisfied, upon our motion, that it ought at least to be investigated.

In support of our 3rd point we refer to the case of *Boteler & Bell vs. The State, use of Chew & Co.*, 7 G. & J., 109, 113, in which the court say, that "No appeal can be prosecuted until a decision has been had in the court below, which is so far final as to settle and conclude the rights of the parties involved in the case, or denying him the means of further prosecuting or defending his suit." . . . . . "It is time enough for a party to apply to this court for redress, when it is ascertained that he is to be injured by the judgment of which he complains." So here the effect of the order appealed from is only in substance the granting of a new trial: it is not conclusive upon the rights of the parties; and if the appellant's accounts are correct, he can suffer no injury by having them investigated. We say, the orders rescinded were obtained by surprise and mistake, and that they were erroneous. This shrinking from investigation is a tacit admission, that they will not bear examination; but at all events the appellant is not entitled to appeal at this stage of the case.

Our 4th point we submit with the single remark, that the

Sappington's Admr. *vs.* Scott.

granting of a new trial, or rescinding a judgment—the effect of which is only to open the case for trial upon its merits—rests in the sound discretion of the court below. But if it were open to examination here, there is nothing in the record even tending to show, that this discretion was improperly exercised in the present case.

ECCLESTON, J., delivered the opinion of this court.

From the record before us it appears that, on the 5th of December 1857, John K. Sappington, as administrator of Wm. Sappington, deceased, exhibited and filed in the office of Register of Wills for Harford county, the first administration account on the estate of the deceased.

"Charlton W. Billingslea, claiming to be and acting as the Register of Wills, made and passed, and endorsed, upon the said account, the following order:

December 5th, 1857.—This account examined and passed.

Test:—C. W. BILLINGSLEA, R. W. H. Co."

Mary Scott of Kentucky, the appellee, as one of the sisters and distributees of the intestate, filed her petition, stating that the appellant obtained his letters of administration, on the 24th of December 1849, and until very recently had rendered no account of his administration. That in October 1857, having understood he intended to claim many large credits and allowances against the estate, which she had reason to believe were not proper to be allowed; she employed counsel to investigate his accounts and to resist the passage or allowance of any account of the administrator against the said estate, until the same should be thoroughly investigated and adjudged correct, after her objections should be heard. That her counsel, as she was informed, gave notice of their employment and instructions, to C. W. Billingslea, who was then acting as register, and relied upon his promise to give them a full and fair opportunity to examine and oppose the passage of any account, which might be presented by said administrator or his counsel, before the same should be acted upon. But by some misunderstanding or neglect of Billingslea no such opportunity was given. And on the 5th of December 1857, the administrator

7    v. 14.

deposited in the register's office an account purporting to be his first administration account, claiming credits for many large sums of money, amounting in the aggregate to $24,761.77. The petition also states that, on the same day, said Billingslea, professing to act as Register of Wills, endorsed that said account had been examined and passed; without any notice to the petitioner or her counsel, or knowledge on their part that the account had been rendered. It is alleged that neither the account nor the items thereof had been examined and passed by the orphans court, or by any one having competent authority to adjudicate thereon. The petitioner avers, and refers to the records and minutes of the court to show, that it was not in session on the said 5th of December, and had not been between that day and the 7th of October preceding. She likewise avers, and states her readiness to maintain and prove, the account to be erroneous; that many of the items thereof were not supported by sufficient proof, that others are unjust and improper to be allowed, and liable to valid and sufficient objections, which she offered to prove if allowed to do so.

The prayer of the petition is, that "the said order and all the orders in relation thereto, or to the claims signed by said Billingslea, and purporting to have been passed on the fifth day of December, eighteen hundred and fifty-seven, or on any other day between that and the fourth day of November next preceding, should be annulled;" and that such further relief in the premises should be granted as might seem just and proper.

This petition was addressed to "the orphans court of Harford county," was filed in the office of the Register of Wills for that county, during the recess of the court, and thereupon the register passed the following order.

"Ordered, by B. H. Hanson, Register of Wills for Harford county, in the recess of the orphans court, this twenty-fourth day of December, eighteen hundred and fifty-seven, that the within petition stand for hearing on the twenty-ninth (instant) and that John K. Sappington, administrator of William Sappington, how cause on the day last named, why the prayer of said petition should not be granted.

B. H. Hanson, R. W. H. Co."

On the day appointed for the hearing, the sheriff returned that he had served a copy of the petition and order on the administrator, John K. Sappington, by leaving the same at his residence, on the 28th of December 1857.

The petitioner appeared on the 29th, but Sappington did not, and the hearing was postponed till the next day, when it was again postponed until the day after, and then Hanson, the register, passed an order in the recess of the orphans court, first reciting that the petition and the order thereon, of the 24th of December, had been duly served upon Sappington, the administrator, that no cause to the contrary had been shown; and then rescinding "the order, bearing date the 5th of December 1857, signed by C. W. Billingslea, as Register of Wills," and all other orders passed or purporting to have been passed by him in relation to the estate of the deceased, and the accounts, against the same, after the 4th of November 1857.

On the 12th of January 1858, Sappington appeared before Hanson, the register, protesting that he had no authority to pass either the order of the 24th or that of the 31st of December, that they were illegal and without due notice to him, (Sappington,) and therefore he appealed.

By agreement the record has been amended, so as to include the admission, that Charlton W. Billingslea was duly elected Register of Wills for Harford county, on the first Wednesday of November 1851, and was thereupon duly commissioned and qualified: that a new election of Register of Wills for Harford county was held, on the first Wednesday of November 1857, when Benedict H. Hanson was duly elected to said office. That his commission (a copy of which is annexed) was issued on the 20th day of November 1857, and that he was qualified and entered upon the execution of the duties of his office on the 7th day of December in the same year.

The Act of 1849, ch. 14, which relates to Harford county, only, in its 3rd section provides, "That the Register of Wills of said county, during the recess of the orphans court, shall have full power and jurisdiction to do all matters and things whatsoever, which the said orphans court could do at its re-

gular sessions, and that there shall be the same right of appeal from any order, decision, or judgment of said register, as may now be had, by law, from the orders, decisions or judgments of the said orphans court."

The Act also creates six terms for the orphans court, which are made to begin and to be held on the first Monday in the months of February, April, June, August, October and December, respectively; "to which terms all process shall be made returnable."

Two questions have been presented by the arguments of counsel:

1st. Was or was not C. W. Billingslea, Register of Wills, on the 5th of December 1857? B. H. Hanson having been elected as register, on the first Wednesday of November preceding, having received his commission, as such, on the 20th of the same month, and not having qualified and entered upon the duties of the office until the 7th of December 1857.

2nd. Was the order passed by B. H. Hanson, as register, on the 31st of December 1857, erroneous?

The first question calls for an interpretation of that portion of the 18th section of the 4th Article of the Constitution, which provides that, "There shall be a Register of Wills in each county, who shall hold his office for six years from the time of his election, and until a new election shall take place." This language, the appellee's counsel say, must be construed according to its natural and ordinary meaning, and if so the office of Billingslea, as register, terminated on the first Wednesday in November 1857, the day on which Hanson, his successor was elected. The theory of the appellant's counsel is, that Billingslea did not cease to be register on the election day, but continued in office until his successor was not only elected but had duly qualified. It is very certain that the latter could not enter upon the duties of the office until he had been regularly qualified. *Thomas vs. Owens*, 4 *Md. Rep.*, 220. It is therefore manifest that, at the end of every six years, there must be some time during which there will be no register of wills, if the appellee's theory is correct. The 14th section of the same article in reference to clerks, makes the

tenure of office six years from the time of election, "and until a new election is held." This language is so very similar to that in regard to registers of wills, as to render it difficult to perceive why the same construction should not apply in each case; and, if we are to look to the language alone, that would seem to justify the interpretation insisted upon by the appellee. But such a construction, in reference to clerks, would make it impossible that other most important provisions of the Constitution could be carried into effect; the consequence of which would be to stop the wheels of government. The 29th section of the 4th article requires that the election returns, of nearly all the officers, shall be certified by the clerks. This duty, if performed at all, must, necessarily, be done by those who were clerks on the day of election, as it cannot be ascertained who are to be their successors in office, until by the certified returns, it appears who are elected. The appellee's doctrine would not only leave the State occasionally, for some time, without clerks and registers, but also without other important officers, whenever new elections of them are to be made.

The constitutional provisions, for filling vacancies, cannot be considered as applying to the period of time between the election day and the qualification of the newly elected officers. At all events, not to the time so intervening, in the ordinary course of such events. If the provisions in reference to vacancies do apply to the time spoken of, then, in the case of a register of wills, the vacancy is to be filled by the orphans court, and their appointee, according to the language of the Constitution, will hold till the next general election. When that takes place, a similar vacancy occurring, a similar appointment may be made. Thus it will be seen that, although the people may regularly elect a register, every six years, yet the appointee of the orphans court may hold the office instead of the person duly elected, by the people. Such results could never have been intended by the Convention in making the Constitution, or by the people in ratifying it.

The appellee's construction, if correct, with regard to a register's tenure of office, must, with equal propriety, be appli-

cable to all elective officers, where the Constitution has not, in express terms, provided that they are to continue in office until their successors shall be elected *and qualified.* The effect of which would be, that each of those offices must, periodically, have no incumbent, authorized to discharge any of the duties thereof, no matter how important, the duties may be, or how urgent the necessity for speedy action. In framing the organic law, by which the government itself was to be kept in operation and regulated, we cannot suppose there was a deliberate intention to make provisions, which should be so construed as to produce a necessary periodical interregnum, in each one of several highly important offices.

The following officers, in express terms, are authorized to hold their offices, until their successors "are elected and qualified," justices of the peace and constables, by Article 4, section 19; State's Attorney's by Article 5, section 1; Lottery Commissioner, (during the continuance of the lottery system,) by Article 7, section 4; and State Librarian, by Article 7, section 7.

By the 1st section of the 6th Article, the Comptroller of the Treasury is to be "chosen by the qualified electors of the State, at each election of members of the House of Delegates." And that election occurs every two years. Nothing more is said, in reference to the duration of the Comptroller's office, when thus elected. But in case of a vacancy, by death or otherwise, the Governor, by and with the advice and consent of the Senate, is to fill such vacancy by appointment, "to continue until another election by the people, and the qualification of the successor."

It was once contended that, when this officer had been chosen, at a regular election, his tenure of office was at an end on the day of the next biennial election. And it was supposed the language of the Constitution required such a construction. If it were so, then, that instrument made a difference in the termination of the office, between the case of a regular election and an appointment by the Governor. Can it be supposed the framers of the Constitution had any such intention? The same reasons which made it necessary and

proper for the officer to hold until his successor should be qualified, in one case, would apply with equal force in the other.

Any doubts, however, which may have existed, in regard to the Comptroller's tenure of office, when elected by the people, were put at rest, by the decision in *Thomas vs. Owens*, 4 *Md. Rep.*, 189. The court say, at page 221, "We see nothing in the Constitution which fixes his term of service at two years from the day of his election, and although it is not anywhere expressly said in the Constitution that he shall continue in his office until his successor has been duly elected, commissioned and qualified, yet, it is obvious to us, that looking to the spirit and policy of the Constitution, as manifested in its provisions, affecting the other officers of the government, in regard to whom it is provided, they shall continue in office until superseded by their qualified successors, that it was not the design of the framers of the Constitution there should be an interregnum in the office of Comptroller, and thereby suspend for the time the whole operations of the Treasury Department of the State. Such a state of things might be fraught with the most calamitous results; the dishonor, for instance, of the State's faith and credit.

"And, in this view, we are strengthened by the 1st. section of the 6th Article, which provides, that when the Governor fills a vacancy in the office of Comptroller, his appointee shall 'continue until another election by the people and the *qualification of the successor*.' "

Some of the views there expressed, we think, apply with much propriety to the present case.

In relation to judges of the Court of Appeals, judges of the Circuit Courts and of the orphans courts, Commissioners of Public Works, Commissioner of the Land Office, the clerks of the Circuit Courts and Registers of Wills, the Constitution does not, in express terms, extend the tenure of their offices, or any of them, until the election and qualification of their successors.

It is exceedingly difficult to assign any good reason, why the extension of the official tenure, until the qualification of a

successor should have been made, in regard to those cases in which it has been done, expressly, and omitted in such as have been mentioned. After searching, in vain, for any probable reason why such a difference should have been made intentionally, we are disposed to conclude it resulted more from accident or inattention than by design. In the aggregate, the offices in reference to which the omission occurs, are certainly more important than the others, and, of course, there is more necessity for preventing them, as far as practicable, from being at any time without officers.

The appellee's counsel concede there is some force in the appellant's argument, that the words, "until a new election," should be construed to mean, "until the result of such election is ascertained." But they say they might safely admit this, for the result of Hanson's election was ascertained, and his commission in his pocket, long before the 5th of December. Once concede that, by construction, Billingslea remained legitimately in office, after the election day, it is difficult to perceive why, by construction, his tenure should not be extended until his successor was qualified. There is not a single instance to be found in the Constitution, where the official tenure is extended beyond the election, that it stops at any point short of the qualification of the successor.

It is not denied, on the part of the appellee, that as the clerks are required to certify the election returns, it is proper to hold that they must continue in office after the election day. But it is said no such duty is required of registers, and therefore the argument, based upon the particular necessity in regard to clerks, can have no application to them. It is true the same kind of necessity alluded to may not exist in both cases. There is, however, a very urgent necessity for preventing the register's office from being closed, for some time, after each election of a new officer. And if language, which is so very similar, in the two cases, as to mean the same thing, may, from necessity, be construed to authorize the extension of the official tenure in one case, why may it not be done in the other?

"Looking to the spirit and policy of the Constitution, as

manifested in its provisions affecting the other officers of the government, in regard to whom it is provided, they shall continue in office until superseded by their qualified successors," we cannot believe "it was the design of the framers of the Constitution there should be an interregnum" in the office of Register of Wills throughout the State, at stated periods.

It will be seen from what has been said, that we think C. W. Billingslea was, *de jure*, Register of Wills on the 5th of December 1857.

The next inquiry is, whether the order of the 31st of December, ought to be reversed ?

The petition praying that the order by which the administration account was passed might be rescinded, was filed on the 24th of December. On the same day the register ordered that the petition should stand for hearing on the 29th instant, and that Sappington should show cause on that day why the prayer of the petition should not be granted. This order did not direct notice of the same should be given. It appears, however, that a copy of the petition and order was left at the residence of Sappington, on the 28th of December. He did not appear on the 29th, 30th or 31st. And on the last named day, the order which has been already stated, was passed.

No answer to the petition was filed, nor was any proof exhibited, for the purpose of sustaining the allegations in the petition.

We presume the order was passed upon the ground, that Billingslea was not Register on the 5th of December, and therefore, the passage of the administration account by him was a void act. As this was not the case, we must reverse the order appealed from, and remand the cause for further proceedings, when the appellee will be at liberty to offer proof in support of his petition.

> *Order reversed, and cause remanded; the*
> *costs in this Court to be paid out of the estate.*

(Decided June 24th, 1859.)