[Civil No. 3028.   Filed October 6, 1931.]

[3 Pac. (2d) 525.]

STATE CONSOLIDATED PUBLISHING COM-
PANY, a Corporation and a Taxpayer of the
City of Tucson, County of Pima, State of Ari-
zona, Appellant, v. BEN C. HILL, as City Attor-
ney of Said City of Tucson; FRANK J. CORDIS,
F. E. GERLACH, W. H. HART, E. D. ROCK-
WELL, P. M. ELIAS and GEORGE L. REID,
as Councilmen of Said City of Tucson; C. E.
PEQUIGNOT, as City Auditor of Said City of
Tucson; and W. A. JULIAN, as Mayor of Said
City of Tucson, Appellees.

Messrs. Linn & Allen, for Appellant.

Mr. Ben C. Hill, *in pro. per.,* and for All Appellees.

ROSS, J.—This action was brought by the State Consolidated Publishing Company, a corporation and a taxpayer of the city of Tucson, to recover for the city from Ben C. Hill, city attorney, and the mayor and common council and the auditor of said city, the sum of $2,000 paid to the said city attorney for special legal services rendered the city during the years 1928 and 1929; such sum being in addition to his regular annual salary of $4,200.

The theory upon which plaintiff seeks to recover said sum, as set forth in its complaint, is that the salary of $4,200 per annum, fixed by the city, is the official and only compensation the city attorney was entitled to be paid; that his appointment to and acceptance of the office at that salary by operation of law limited his compensation to that sum; or that, if he were an employee, it was implied by his contract of employment that he would do all the legal business ordinarily appertaining to such office for the stated and fixed sum of $4,200 per annum; and that the service he performed and for which he charged the city the $2,000 was within his agreed or implied duties as city attorney. It is further alleged that the payment of $2,000 to City Attorney Hill for special legal services was *ultra vires* and void: (1) Because the city budget for the fiscal year 1928–29 did not include

said sum, or any sum, for special legal services of the city attorney; (2) because the $2,000 paid the said city attorney was taken from the city's sinking fund, designated as bond interest fund and bond redemption fund, collected for the purpose of paying interest on the city's outstanding bonds and redeeming such bonds at maturity.

The defendants' answer was a general denial.

Judgment went in favor of defendants and against plaintiff, and the latter has appealed.

The facts are not in dispute and may be stated to be as follows: In October, 1928, it was discovered that the city treasurer of Tucson, George F. Gray, was short in his accounts with the city in the sum of $173,000. The mayor and common council of the city thereupon instructed City Attorney Hill to take full charge and to investigate the shortage and defalcation and to that end authorized him to employ all necessary help, including attorneys, accountants, detectives, etc., which he did. On or about April 16, 1929, Steward, Sawyer & Hart, who were Gray's bondsmen, paid into the city on account of said shortage $50,000. On the same day the Southern Arizona Bank & Trust Company, a depository of the city's, paid on such account, as a compromise on its asserted liability, $30,000, and on May 31, 1929, $23,844. All told, $103,844 was collected and paid to the city on account of the $173,000 defalcation. On April 20th City Attorney Hill presented to the mayor and common council a bill in the sum of $2,000 "for special legal services rendered in connection with the investigation of George F. Gray's defalcation and settlement with the Southern Arizona Bank and Trust Company," and on April 24th the claim was allowed and paid by the city.

Defendant Hill had been, under appointment by the mayor, the city attorney of Tucson continuously from January 1, 1921, up to and including the years 1928

and 1929. In other words, he had received the appointment five times, for terms of two years each; his first appointment being January 1, 1921, and his last appointment January 1, 1929. His salary during the last two terms was fixed and paid him by the mayor and common council at $4,200 per annum. The trial court found or stated that such salary was not fixed by any charter provision or ordinance of the city, but it is not questioned that the office of city attorney existed and that the city possessed the power to fix and pay the occupant a regular annual salary. It was also said by the trial court that the duties of city attorney were not prescribed or defined by the charter or any ordinance of the city. Because of the nature of the office and the well-known duties thereof, the omission to state or define them in the charter or ordinances, we think, is unimportant. It is a matter of common knowledge that the city attorney is the head of the legal department of the city. He stands to his city what the Attorney General stands to the state or the county attorney to the county. Generally his duties require him to represent the city in its litigation and to give legal advice to the heads of departments. Of course, his duties might be by charter or ordinance broadened or narrowed, but in the absence of a provision to that effect we would assume that they are such as customarily and generally appertain to the office of chief legal adviser of a city. As such legal adviser, one of his principal duties, it is obvious, was to assist the other officers of the city in preserving and safekeeping its funds, and to institute proceedings for their recovery when unlawfully diverted, paid out, or embezzled.

Most of appellant's assignments are directed at the court's refusal of its offer to prove the city attorney's engagement was one of contract; that he had agreed to do all the legal services usually and customarily

performed by such officer for the fixed salary of $4,200 per annum; and that what he did to recover the city's money from the defaulting treasurer primarily appertained to the office and its duties, and was covered by the salary. The court rejected this theory of employer and employee, and correctly so.

The position of city attorney is an office and its occupant an officer. He is appointed by the mayor; his term of office is two years; he is paid a salary on a yearly basis, regardless of the amount of work he does. He receives the same salary whether called upon once or a hundred times to do battle for the city or to advise the heads of the different departments.

The defendants take the position that there is no provision of the city charter, no city ordinance, and no law, constitutional or statutory, making it unlawful for the mayor and common council to pay the city attorney the $2,000 for special services over and above the regular salary, and that is the question to be decided. The charter is silent as to the right and power to increase or diminish the salary of city officers of Tucson during their terms, and there is no ordinance speaking on the subject. There is nothing in the general statutory laws of the state either granting or denying the right of the city authorities to increase or diminish salaries of city officers during their terms. If such power is denied the legislative body of an incorporated city, it must be found in the state Constitution. Section 17, part 2, article 4 of that instrument reads as follows:

"The Legislature shall never grant any extra compensation to any public officer, agent, servant, or contractor, after the services shall have been rendered or the contract entered into, nor shall the compensation of any public officer be increased or diminished during his term of office."

It will be noted that there are two inhibitions in this section of the Constitution. One is directed

against grants of extra compensation by the legislature. It is a prohibition against the legislature, or a restraint specifically upon the legislative power of the state. But the other inhibition of said section is not directed specifically against the state legislature or any other legislative body. It is broad enough in its terms to inhibit any legislative body empowered to fix salaries of public officers from increasing or diminishing such salaries during their terms of office. Section 17, *supra,* is an exact rescript of section 25, article 2, of the Constitution of the state of Washington. In that state, although there are other provisions of the Constitution specifically prohibiting increases and decreases in the compensation of state officers during their terms (section 25, art. 3), judges of the supreme and superior courts (section 13, art. 4), and county, city, town or municipal officers after election or during term (section 8, art. 11), the highest court of that state has decided that the general prohibition of section 25, article 2, identical with our section 17, part 2, article 4, *supra,* operates against all "salary fixing" bodies.

In *State* v. *Wardall,* 107 Wash. 606, 183 Pac. 67, the question was whether the voters of the "port of Seattle," a municipal corporation, could lawfully, by a popular referendum vote, increase the salaries or compensation of the board of commissioners of the port during their term of office. The court, after quoting section 25 of article 2 and section 8 of article 11, *supra,* as bearing upon the question, said:

"These provisions of the Constitution, it may be premised, since they are prohibitory in their nature, are self-executing, binding alike upon the authority empowered to fix salaries or compensation of public officers, whether that authority be the Legislature, a board or commission, or, as in this instance, the Legislature with the concurrence of the electorate affected by the increase. . . .

"Since the constitutional prohibitions operate against the district as well as the state, it must follow, we think, that the rule of the Constitution is as applicable to this commissioner as it is to the others."

In *Heilig* v. *City Council*, 7 Wash. 29, 34 Pac. 164, section 25 of article 2 was applied to the salary of city councilmen, and in *State* v. *Saillard*, 22 Wash. 267, 60 Pac. 651, to the salary of policemen.

We quote from *State* v. *Clausen*, 111 Wash. 241, 190 Pac. 324, the reasons why these restrictions upon salary fixing bodies were incorporated into the fundamental law:

"After reviewing these various provisions of the Constitution in *State ex rel.* v. *Clausen*, 47 Wash. 372, 91 Pac. 1089, *supra*, it was said: 'So that it will be seen that it was a positive policy of the Constitution, expressed in every possible way, that the salaries of officers should not be increased during their term of office. This wise provision was no doubt intended to prevent pernicious activity on the part of the office holders of the state being brought to bear upon the members of the Legislature—a wise provision which must not be construed out of existence or evaded by legislative enactment.'

"A similar comment is found in *State ex rel. Port of Seattle* v. *Wardall* [107 Wash. 606], 183 Pac. 67, as follows: 'Other courts have said that such provisions also have an additional purpose, namely, to prevent the salary fixing body from rewarding their friends and punishing their enemies, which they were sometimes wont to do, by increasing the salaries of those in favor and decreasing the salaries of those whose actions did not meet with the approval of that body.' "

Unlike Washington, we have no specific restriction against increasing or diminishing the salaries or compensation of state, county or municipal officers. The only restraint is the general one "nor shall the compensation of any public officer be increased or diminished during his term of office."

The decisions of the Washington courts clearly indicate that had the only prohibition in that state's Constitution been a general one, of which ours is a copy, the result would have been the same.

In *County of Greenlee* v. *Laine,* 20 Ariz. 296, 180 Pac. 151, the right of a judge of a superior court to accept an increase in his salary during his term was involved. We said:

"Section 17 comprehends both increases and decreases of compensation, and forbids them during any public officer's term of office. It includes in its terms all 'public officers,' and announces a rule of compensation binding upon all alike, superior judges among others. . . .

"No public officer's compensation is excepted from the terms of section 17, and it is a general rule that, where no exception is made in terms, none will be made by mere implication or construction. . . .

"The plain, explicit, and unambiguous language of section 17, as we hope later to show, is a constitutional declaration of policy that public officers' compensation, when once fixed should be inviolate, at least during the term for which the officer was elected. In it is to be found 'the real intent' of the framers of the Constitution and the people who voted for it. . . .

"This expression ['nor shall the compensation of any public officer be increased or diminished during his term of office'] is explicit, unambiguous, and free from doubt. It is all-inclusive."

It would be just as reasonable to say the recall provision of the Constitution, reading: "Every public officer in the State of Arizona, holding an elective office, either by election or appointment, is subject to recall from such office by the qualified electors of the electoral district from which candidates are elected to such office" (section 1, art. 8), does not include municipal officers, as to say the prohibition against increasing the compensation of "any public officer" does not include municipal officers. And one could just as reasonably argue that the prohibition of sec-

tion 23 of article 4 of the Constitution, wherein this language is used: "It shall not be lawful for any person holding public office in this State to accept or use a pass or to purchase transportation from any railroad or other corporation, other than as such transportation may be purchased by the general public," does not include municipal officers. It is not to be supposed the framers of the Constitution would have forbidden the legislature to disturb salaries of officers ordinarily fixed by that body, such as state and county officers, and left other tax-paying units of the state exercising delegated legislative authority to play fast and loose with their officers' salaries as rewards or punishments. It is rather to be supposed that they adopted language covering all officers within the sphere of the evil sought to be stricken down.

Pennsylvania has a general provision in its Constitution which "invalidates any law extending the term of any public officer, or increasing or diminishing his salary during his term." Article 3, § 13. It was contended there that this provision applied only to constitutional officers but the courts of that state have held that it reached and affected municipal officers (*Brooke* v. *Commonwealth*, 86 Pa. 163, and *Houseman* v. *Commonwealth*, 100 Pa. 222) and, indeed, all public officers, whether constitutional or not (*Richie* v. *City of Philadelphia*, 225 Pa. 511, 26 L. R. A. (N. S.) 289, 74 Atl. 430, 431).

Section 10 of article 23 (Williams' § 359) of the Constitution of the state of Oklahoma, reads, in part, as follows:

"Except wherein otherwise provided in this Constitution, in no case shall the salary or emoluments of any public official be changed after his election or appointment. . . . "

In the case of *Turner* v. *Ramsey*, 63 Okl. 199, 163 Pac. 712, it was held that the salary of the commis-

sioners of the city of Lawton could not be increased during their terms because of the above constitutional prohibition, on the theory that it reached all public officers. Its language is no more comprehensive than our section 17, *supra.*

But it is said this court took the contrary view in *Patty* v. *Greenlee County,* 14 Ariz. 422, 130 Pac. 757. The facts in that case were that the board of supervisors of Greenlee county, acting under the authority of section 4 of article 12, of the Constitution, fixed the salary of Patty as sheriff of Greenlee county, and the legislature had come along and changed the salary so fixed. The question was whether the legislature, in the face of section 17, part 2, article 4, of the Constitution had the power and right to change the salary. We held that it did have such power, and it is only necessary to read section 4, article 12, *supra,* to demonstrate the absolute correctness of that decision. It reads, in part: ''The Board of Supervisors of each county is hereby empowered to fix salaries for all county and precinct officers within such county for whom no compensation is provided by law, and the salaries so fixed shall remain in full force and effect until changed by general law.'' We held in the Patty case that the power of the board of supervisors to fix salaries under this section was temporary and to be exercised only during the interim between the dates of admission to statehood and proper legislation by general law. To the same effect is the holding in *Board of Supervisors* v. *Stephens,* 20 Ariz. 115, 177 Pac. 261.

The constitutional prohibition is against the increasing or diminishing of the compensation of ''any public officer.'' If the city attorney of Tucson is a public officer, his compensation cannot be lessened or enlarged during his term without violating the Constitution. The giving of the $2,000 in addition to his regular salary was obviously an increase.

In *Winsor* v. *Hunt,* 29 Ariz. 504, 243 Pac. 407, we had occasion to define a "public office," and, after quoting definitions of various courts, we said:

"We think that in 22 Ruling Case Law, 381, § 12, the chief elements of a 'public office' are well summed up. The specific position must be created by law; there must be certain definite duties imposed by law on the incumbent, and they *must involve the exercise of some portion of the sovereign power.* A position which has these three elements is presumably an 'office,' while one which lacks any of them is a mere 'employment.' "

The definition of "a public office," as quoted in *Walker* v. *Rich,* 79 Cal. App. 139, 249 Pac. 56, is as follows:

" 'A public office,' says Mr. Mechem, in his work on Public Officers, in section 1, 'is the right, authority and duty, created and conferred by law, by which for a given period, either fixed by law or enduring at the pleasure of the creating power, an individual is invested with some portion of the sovereign functions of the government, to be exercised by him for the benefit of the public.' "

It is said in *Richie* v. *City of Philadelphia, supra:*

"In every case in which the question arises whether the holder of an office is to be regarded as a public officer within the meaning of the Constitution, that question must be determined by a consideration of the nature of the service to be performed by the incumbent and of the duties imposed upon him, and whenever it appears that those duties are of a grave and important character, involving in the proper performance of them some of the functions of government, the officer charged with them is clearly to be regarded as a public one."

From what we have said about the dignity and importance of the office of city attorney, and the responsibilities and duties appertaining thereto, it is obvious that both the office and the officer are public

and vested with some of the functions of government. It is clear to us that the $2,000 paid the city attorney in addition to his regular salary was an increase in his compensation during his term of office and illegal because forbidden by section 17, part 2, article 4, of the Constitution.

This conclusion renders unnecessary a consideration of the other errors assigned.

The judgment is reversed and the cause remanded, with directions that judgment be entered for plaintiff as prayed.

McALISTER, C. J., and LOCKWOOD, J., concur.