[Civil No. 3281. Filed December 21, 1932.]

[17 Pac. (2d) 802.]

A. M. CRAWFORD, Petitioner, v. GEORGE W. P. HUNT, Governor, ANA FROHMILLER, State Auditor, and MIT SIMMS, as State Treasurer, Respondents.

Messrs. Favour & Baker, for Petitioner.

Mr. K. Berry Peterson, Attorney General, and Mr. Charles L. Strouss, Assistant Attorney General, for Respondents.

LOCKWOOD, J.—A. M. Crawford, hereinafter called plaintiff, filed an original petition in this court against George W. P. Hunt as Governor, Mit Simms as treasurer, and Ana Frohmiller as auditor of the state of Arizona, hereinafter called defendants, to compel the issuance and payment to him of state warrants in the aggregate of $7,000 which petitioner claims is due him from the state for salary as legislative examiner from July 1st, 1931, to August 31st, 1932, by virtue of the provisions of chapter 45 of the Session Laws of 1929. Defendants demurred generally and then answered setting up in substance three defenses: (a) That the amount claimed may not be paid for the reason that no appropriation from the funds of the state has been legally made for such payment; (b) that, if such appropriation does exist, plaintiff has failed to perform the duties imposed upon him by said chapter 45, *supra,* from June 30th, 1931, to the date of this proceeding and has thereby vacated his office; and (c) that, if any right of action for said sum ever existed, it is barred by the failure of plaintiff to bring an action to recover it within ninety days from the time it became due, as provided by section 2804, Revised Code 1928. To this answer plaintiff demurred, and the case has been submitted to us on the pleadings.

The facts, with one exception, are undisputed, and we state them as follows: In 1929 the ninth legislature of the state of Arizona adopted chapter 45, *supra,* which chapter was duly approved by the Governor and became law immediately after its approval,

since it carried the emergency clause. It reads, so far as material for the purposes of this opinion as follows:

"Section 1. The office of Legislative Examiner is created hereby. . . .

"Section 2. The term of office of the Legislative Examiner shall be six years, unless for cause he shall be sooner removed by the Legislature. . . .

"Section 3. The Legislative Examiner shall receive a salary of six thousand dollars per year, and his necessary traveling and hotel expenses, while absent from the capital city in the performance of his official duties. . . . "

"Section 6. The Legislative Examiner shall submit to the Legislature, at the beginning of each regular session, a detailed report of the condition of the several departments of state and state institutions, and of the manner in which the expenditures of money appropriated by the Legislature have been and are being expended, and he shall be at all times subject to the call of the Legislature or of any committee thereof.

"Section 7. It shall be the duty of the Legislative Examiner to submit to the Legislature, upon the convening of each regular session thereof, or, when requested so to do, upon the convening of any special session, such data as may be helpful to the Legislature in making appropriations. . . .

"Section 8. The Legislative Examiner shall be provided with suitable offices on the legislative floor of the Capitol Building, and shall have the right, within the limits of the appropriation for the maintenance of his office, to employ such assistants and stenographers, and to incur such expense in the conduct of his office as may be necessary to carry out the purposes of this act.

"Section 9. For the fiscal year 1929–1930, the sum of fifteen thousand dollars, and for the fiscal year, 1930–1931 the sum of fifteen thousand dollars, or so much thereof as may be necessary to carry out the provisions of this act, is hereby appropriated out of any moneys in the general fund not otherwise appropriated, and the auditor is instructed to draw his

warrants for claims, duly approved by the Legislative Examiner, and the state treasurer is directed to pay the same.

"Section 10. All acts and parts of acts in conflict with the provisions of this act are hereby repealed."

Thereafter in accordance with the terms of the chapter plaintiff was duly appointed as legislative examiner, and on July 1st, 1929, entered upon and performed the duties imposed on him by the chapter, at least until June 30th, 1931. The tenth legislature, which met in January, 1931, in the General Appropriation Bill included an appropriation for the salaries and expenses of the office of the legislative examiner, but the same was vetoed in its entirety by the Governor, after the adjournment of the legislature. The legislative examiner was paid his salary as provided by the chapter up to July 1st, 1931, after which defendants refused to issue or pay to him any more salary warrants. It is contended by him, and denied by defendants, that he performed the duties of his office ever since that date, but at all events no action of any nature was filed by him to compel the payment of any salary until this petition for *mandamus* was filed September 29th, 1932.

We consider the three defenses to the action above stated in their order. It is not disputed by defendants that the office of legislative examiner exists and plaintiff was duly appointed thereto, and that, if he has continued to perform its duties, the state owes him the salary fixed by chapter 45, *supra,* and sued for by him, but they contend that no money may be paid out of the state treasury except when an appropriation therefor exists, notwithstanding the state owes the money, and that no appropriation has been made to cover the salary for which plaintiff is suing.

The latter agrees that he cannot recover unless an appropriation exists, but it is his position that a continuing appropriation for the payment of his salary

was made by chapter 45, *supra,* and that the legislature may not alter it during his present term of office.

It is well settled that no special form of language is required to make an appropriation. If it be the intent of the appropriating body that the money in question be paid, it makes no difference in what terms such intent is expressed. *Shattuck* v. *Kincaid,* 31 Or. 379, 49 Pac. 758; *Carr* v. *State,* 127 Ind. 204, 26 N. E. 778, 22 Am. St. Rep. 624, 11 L. R. A. 370; *State* v. *Jorgenson,* 25 N. D. 539, 142 N. W. 450, 49 L. R. A. (N. S.) 67; *Menefee* v. *Askew,* 25 Okl. 623, 107 Pac. 159, 27 L. R. A. (N. S.) 537; *Humbert* v. *Dunn,* 84 Cal. 57, 24 Pac. 111; *Reynolds* v. *Taylor,* 43 Ala. 420.

There have been many cases where a statute created an office and fixed a salary therefor and it was held that in the absence of some constitutional or statutory expression to the contrary a continuing appropriation was made by the creation of the office and the fixing of the salary alone. *People* v. *O'Ryan,* 71 Colo. 69, 204 Pac. 86; *State* v. *Eggers,* 29 Nev. 469, 91 Pac. 819, 16 L. R. A. (N. S.) 630; *State* v. *Jorgenson, supra; Reed* v. *Huston,* 24 Idaho 26, 132 Pac. 109, Ann. Cas. 1915A 1237; *Dorman* v. *Sargent,* 20 N. M. 413, 150 Pac. 1021; *People* v. *Goodykoontz,* 22 Colo. 507, 45 Pac. 414; *State* v. *Sargent,* 18 N. M. 272, 136 Pac. 602; *Reynolds* v. *Taylor, supra; State* v. *Bordelon,* 6 La. Ann. 68; *Ristine* v. *State of Indiana,* 20 Ind. 328; *State* v. *Grimes,* 7 Wash. 191, 34 Pac. 833.

In chapter 45, *supra,* section 3 thereof states ''the Legislative Examiner shall receive a salary of six thousand dollars per year.'' Language of this nature in practically all of the decisions above cited is held to express an intent of the legislature that the salary shall be paid and is therefore an appropriation. Indeed it is the height of absurdity to suppose that any legislature would deliberately establish an office, fix a term and a salary for an officer, and yet

intend he should not receive it. We hold, therefore, in line with the overwhelming weight of authority, that such action on the part of the legislature is an appropriation of the amount necessary to pay the salary of the legislative examiner until in some legal manner the appropriation so made ceased.

It is contended, however, that the fact that the chapter contains an express appropriation for two years only negatives the idea that the legislature intended the salary should be paid beyond such time. In this connection it should be noted that the amount of that appropriation is greatly in excess of what was needed to pay plaintiff's salary, and was obviously meant to cover, in the greater part at least, the expenses of the office referred to in section 8 of the chapter, and it might well be said the specific appropriation was made because it was necessary to provide for the contingent expenses of the office, and that an amount sufficient to pay plaintiff's salary was included merely in accordance with custom.

We think, however, the decisive factor in this case is the general public policy of the state, as set forth in our Constitution, and we prefer to rest our decision on that ground.

The fundamental principle of democracy is that the people are sovereign and that all instrumentalities of the government are in the long run subject to their will. Government is and always has been logically, although not always formally, divided into three departments—the legislative which makes the laws, the judicial which interprets them, and the executive which enforces them. While at times one person has exercised power of all three kinds, nevertheless fundamentally the divisions have always existed. Our system of government has come down to us in great measure from England. Immediately after the Norman Conquest all the different functions of government were united in the person and author-

ity of the king, and the only refuge of the people in time of oppression was armed revolution. The first serious attempt at limitation of the kingly power was the Magna Carta, but even this was rather the denial of certain rights to the king than an affirmance of power in the people. The first active participation which the latter had in the government was through the House of Commons and even down to comparatively modern times the effective power of the people over the executive and judicial branches of the government was limited to such pressure as they were able to apply through that house. The people for centuries had nothing to say as to the appointment or removal of the executive authorities, from the king down to the humblest constable. They had nothing to do with the appointment or removal of the judiciary. There was no Constitution emanating from them in the modern sense of the term, nor did they have any method of direct legislation. Their sole manner of participating in the government of the country was through their chosen representatives in Parliament and by such pressure as these representatives could bring to bear upon the other branches of the government, and the only pressure available to the House of Commons originally was its control of the purse. For this reason it was but logical and proper, in the development of the fundamental principle of democracy that the people in the end are the supreme law, that the only instrument they had of enforcing their will, to wit, the control of the purse strings, should be rigidly and jealously confined to the only branch of the government over which they had direct power. Every gain in the power of the House of Commons, and therefore in the power of the people, was made through its control of the power of appropriating money. It is not to be wondered that those in whom this theory of government and democracy has been ingrained, both then and

now, consciously or unconsciously, insist that the power to appropriate is in the hands of the legislative branch of the government only and that such branch may exercise it or not as it sees fit, without control from any other source. When, however, the American system of government was established, there was a new and radical departure from the English plan. Our various governments, both state and federal, were created by the people through *direct* legislation of the highest class, to wit, written and formal Constitutions. These Constitutions do not derive their power and authority from the representatives of the people but from the people themselves, and not only do they contain *grants* of the only power which any of such representatives have but they also have in them many *limitations* upon the power of those representatives. It is therefore a truism to state that the will of the people, even though it is merely intimated and not expressly stated in a constitutional provision, so long as the intimation is clear and unmistakable, is superior to the strongest and most formal declaration of the representatives created by such Constitution, be they legislative, executive, or judicial.

All of the Constitutions of the different states recognize clearly the division between the three great branches of the government. All of them express more or less clearly the intent that each of said branches is to be independent of the other two, except as the Constitution provides otherwise, and that, except as the Constitution authorizes it, neither can exercise any power which directly or indirectly tends to limit the constitutional independence and power of the other branches of the government. Article 3, Constitution of Arizona. These general principles are so obvious to anyone who is at all familiar with the constitutional history of England and America that no citations are necessary to support them, al-

though hundreds of cases exist which declare them either in whole or in part. But with the natural and human desire for power, the representatives of the different branches of the government have at times, either intentionally or unintentionally, attempted to encroach on each other, and many years ago the question of whether the unlimited legislative control over the purse strings inherent in the English system still existed under our constitutional governments arose. The first and indeed still the leading case which declares the rule applicable to the control of the legislature over the salaries of officials of other branches of the government under constitutional provisions similar to that contained in section 17, part 2, article 4 of our Constitution, is that of *Thomas* v. *Owens,* 4 Md. 189. Our constitutional provision above cited reads, so far as material to this case, as follows:

"Section 17. . . . Nor shall the compensation of any public officer be increased or diminished during his term of office. . . . "

The Constitution of Maryland contained substantially the same language. The opinion of the court in *Thomas* v. *Owens, supra,* states the law as to the effect of such provisions so clearly and forcibly that we quote from it as follows:

"Under our system of government its powers are wisely distributed to different departments; each and all are subordinate to the constitution, which creates and defines their limits; whatever it commands is the supreme and uncontrollable law of the land. . . .

"In the construction of any instrument the whole paper ought to be considered, that the will of its framers may be truly and accurately ascertained; the objects contemplated and the purposes to be subserved should be constantly kept in view, and the language used interpreted in reference to the manifest intent. . . .

"In assigning the powers of government to three different departments, the constitution intended to

secure to each its independency of action, and the more certainly and effectually to ensure this, *it* has ascertained and appropriated the salary they are severally to receive; and it has inhibited the legislature from diminishing it. Were it not for such a provision, the whole government would exist only by the permission of the legislature. It can only be carried on through the instrumentality of individuals, and their services can only be obtained by being paid for. The framers of the constitution, and the people who adopted it, aware of this, determined not to submit the durability of their work to the caprice, passion or prejudice, which possibly might, at times of great excitement, triumphantly rule the action of the legislature; and, therefore, wisely did the work themselves by engrafting in the organic law a provision for the protection of those who should be charged with its execution; in other words, they made the appropriation.

"An opposite interpretation would countenance this paradox, that a co-ordinate branch of the government could stop its whole machinery, by refusing to pay the salaries of those upon whom is devolved the discharge of the duties of the other branches; and this too when the constitution expressly declares that these officers '*shall receive*' their salaries, and that they '*shall not be diminished.*' 'It would be giving to the legislature a practical and real omnipotence, with the same breath which professes to restrict their powers within narrow limits. It is prescribing limits, and declaring that those limits may be passed at pleasure.' [*Marbury* v. *Madison*], 1 Cranch 178 [2 L. Ed. 60].

"Now, it is presumed, it would not be contended by anyone, however hazardous, that if the legislature were to pass an act diminishing the salary of the governor, or of any other officer whose salary is fixed by the constitution, that such an exercise of power would be rightful and constitutional. If it be not competent to the legislature to take away *a part,* by what process of reasoning can it be maintained that they can take away the whole? And yet this is the extent to which the argument addressed to us

goes. It seems to us to be but necessary to state the proposition, to cause its instantaneous rejection.''

This case has been cited and followed directly on the facts or approved in principle in the following cases: *State* v. *Hickman,* 9 Mont. 370, 23 Pac. 740, 8 L. R. A. 403; *State* v. *Burdick,* 4 Wyo. 272, 33 Pac. 125, 24 L. R. A. 266; *Green* v. *Purnell,* 12 Md. 329; *State ex rel. Roberts* v. *Weston,* 4 Neb. 216; *State* v. *Weston,* 6 Neb. 16; *State* v. *Sargent, supra*; *Weston* v. *Herdman,* 64 Neb. 24, 89 N. W. 384; *People* v. *Goodykoontz, supra; Dorman* v. *Sargent, supra; Reed* v. *Huston, supra*; *State* v. *Jorgenson, supra; Carr* v. *State, supra; State* v. *State Treasurer,* 68 S. C. 411, 47 S. E. 683; *State* v. *Hickman,* 10 Mont. 497, 26 Pac. 386; *State* v. *Eggers, supra; People* v. *O'Ryan, supra.*

Indeed, so far as we have been able to ascertain, the general principles laid down in *Thomas* v. *Owens* and quoted by us above have been denied only in four cases: *Myers* v. *English,* 9 Cal. 341, and those cases which follow it in reasoning and generally in terms, to wit, *People* v. *Russel,* 311 Ill. 96, 142 N. E. 537, *Pickle* v. *Finley,* 91 Tex. 484, 44 S. W. 480, and *Menefee* v. *Askew, supra,* and questioned in the case of *Shattuck* v. *Kincaid, supra,* where the court also refers to the two cases of *Thomas* v. *Owens, supra,* and *Myers* v. *English, supra,* and admits that the decided tendency of the adjudications is in support of the doctrine of *Thomas* v. *Owens,* although it refuses, for reasons set forth in the opinion, to apply the rule in the particular case.

In the Myers case the court states as follows:

''It is very true that the Legislature possesses the power to stop the whole machinery of government, whenever it is willing to take the responsibility of doing so. . . .

''We think the power to collect and appropriate the revenue of the State is one peculiarly within the

discretion of the Legislature. It is a very delicate and responsible trust, and if not used properly by the Legislature at one session, the people will be certain to send to the next more discreet and faithful servants. . . .

"Therefore, when the Legislature fails to make an appropriation, we cannot remedy that evil. It is a discretion specially confided by the Constitution to the body possessing the power of taxation. . . .

"We must trust to the good faith and integrity of all the departments. Power must be placed somewhere, and confidence reposed in someone."

It will be seen that this opinion is based upon the idea that the legislative branch of the government is in effect supreme, even though its action results in stopping the whole machinery of the government, a conclusion diametrically opposed to our theory that the different branches of the government are within their respective spheres equal and independent.

Were the question one of the salary of a constitutional officer where the Constitution uses the same language as or similar to that of chapter 45, *supra,* to the effect that the officer "shall receive" his salary, there can be no question that the language is a sufficient appropriation to require that the auditor draw the warrant for the salary of the officer and that the treasurer pay the same without any further action on the part of the legislature. *Windes* v. *Frohmiller,* 38 Ariz. 557, 3 Pac. (2d) 275. It is contended, however, that, though this may be true as to constitutional officers, the same rule does not apply to offices created by the legislature and not by the terms of the Constitution itself. This point has been considered in the case of *State* v. *Burdick, supra,* wherein the court says:

"Although some courts seem to distinguish between salaries fixed by the constitution and those fixed by an unrepealed statute, it seems that this is a dis-

tinction more nice than wise. In either case, the people have given their assent to the measure,—in one method by their organic law, which they have accepted, adopted, and ratified by their votes, and in the other by their representatives in the legislature. The salaries are to be fixed by law, and all such officers, whether of the state, county, city, town, or school, 'shall be paid fixed and definite salaries.' Article 14, § 1, Const. Wyo. The law relating to the state examiner provides that he 'shall receive' an annual salary of $2,000, and the constitution requires that his compensation shall be fixed by law, and shall be a fixed and definite salary, which shall not be increased or diminished after his election or appointment. It will be conceded that the second legislature could not have reduced his salary during his term, either by a direct act for that purpose or in an appropriation bill. It is equally clear that they could not take it away, directly or indirectly. An imperative direction to create the office is found in the constitution, and the same authority is bestowed in that instrument to fix the compensation. The first state legislature, in obedience to that mandate, did create the office, and fix the compensation of the officer. This law has not been repealed. If the constitution had fixed the salary, and the time and manner of payment, there would have been no doubt, under the great weight of authority, that this would have been an appropriation made by 'law,' as the supreme law had so provided, and an act of the legislature, it seems, would have been unnecessary.''

Even the case of *Myers* v. *English, supra,* which repudiates the doctrine laid down in *Thomas* v. *Owens,* admits that the same principle should in reason apply to legislative as to constitutional offices and we think this is correct.

Section 17 of part 2 of article 4, *supra,* applies to all officers having fixed terms and to the acts of all salary fixing bodies. *State Consolidated Pub. Co.* v. *Hill,* 39 Ariz. 21, 3 Pac. (2d) 525; *Gay* v. *City of Glendale, ante,* p. 207, 16 Pac. (2d) 971,

If the legislature were to pass an act stating expressly that the salary of the legislative examiner, as provided in chapter 45, *supra,* should be eliminated entirely during his present term of office, we would unhesitatingly pronounce it unconstitutional, and there is no court in the land but would reach the same conclusion. But it may be said the mere failure of the legislature to pass an appropriation does not *diminish* the officer's salary; it merely *postpones* the payment thereof. On this theory, if the legislature through such failure postpones the payment for two years, it may do so for four, ten, twenty or fifty years, until the officer, as well as his term, has expired without the receipt by him of the salary which the law says he *shall* receive, and yet the constitution has not been violated. This would indeed be to prefer the form to the substance, and make a mockery of the obvious intent and purpose of the Constitution.

Remembering that constitutional provisions are to be construed liberally in order to carry out the purposes for which they were obviously adopted, we think it would be an absurdity to hold that, while the legislature may not in specific terms reduce the salary of a public officer during his term of office, it may do the same thing by merely failing to act. As is said in *Thomas* v. *Owens, supra:*

"It would be giving to the legislature a practical and real omnipotence, with the same breath which professes to restrict their powers within narrow limits. It is prescribing limits, and declaring that those limits may be passed at pleasure. . . . "

It may be urged that the effect of such a construction of the Constitution would be to "ham-string" the legislature in its control over the various offices which exist only by its will. This, however, is not the case.

The office of legislative examiner as set up in chapter 45, *supra,* is not a constitutional but a statutory

one. Such being the case, the legislature has the power to abolish the office. *Sanchez* v. *United States,* 216 U. S. 167, 30 Sup. Ct. Rep. 361, 54 L. Ed. 432; *Ford* v. *Board of State Harbor Commrs.,* 81 Cal. 19, 22 Pac. 278; *Attorney General* v. *Jochim,* 99 Mich. 358, 58 N. W. 611, 41 Am. St. Rep. 606, 23 L. R. A. 699; *Moore* v. *Humboldt County,* 46 Nev. 220, 204 Pac. 880, 210 Pac. 401; *People* v. *Coler,* 173 N. Y. 103, 65 N. E. 956; *Goetz* v. *Smith,* 152 Tenn. 451, 278 S. W. 417; *Cowell* v. *Ayers,* 110 Tex. 348, 220 S. W. 764. And the abolition of an office terminates the right of the incumbent to exercise the rights and duties thereof. *Touart* v. *State,* 173 Ala. 453, 56 South. 211. And he has no further right to compensation. *Orahood* v. *City and County of Denver,* 41 Colo. 172, 91 Pac. 1116; *Meissner* v. *Boyle,* 20 Utah 316, 58 Pac. 1110; *Wittmer* v. *New York,* 50 App. Div. 482, 64 N. Y. Supp. 170. Nor is this right affected by a constitutional provision that the compensation of an officer may not be changed during his term of office. *Dunn* v. *Dean,* 196 Ala. 486, 71 South. 709; *State* v. *Wilson,* 106 Ohio St. 224, 140 N. E. 183; *Town of Luther* v. *Crossley,* 45 Okl. 611, 146 Pac. 583; *Bogue* v. *City of Seattle,* 19 Wash. 396, 53 Pac. 548.

If the legislature, for any reason whatever, deems it unnecessary or improper to continue an office which it has created, it may abolish it at will, and, when the office falls, the officer holding it falls with it and the constitutional provision involved herein has no bearing on such a case. But if the legislature's real motive is not a belief that the *office* is unnecessary in the public interest but a desire to embarrass, harass or injure the *individual occupant* thereof, not by his removal in the manner prescribed by law but by depriving him of the remuneration given him by the law, and doing so in an indirect manner when it is without power to accomplish the same result directly,

we think the constitutional inhibition should and does apply. The facts of the case at bar show the evils which can arise from the construction of the law contended for by defendants. The law-making power is composed of the two houses of the legislature and the Governor in the exercise of his veto power. All laws must have the approval of these three agencies. Chapter 45, *supra,* was so approved. The only reason why an appropriation was not made for the payment of the salary of the legislative examiner during the fiscal years 1931–32 was that one only of those three agencies objected thereto, the other two desiring the appropriation. It seems to us that to permit one-third of the law-making power to undo indirectly what the three-thirds has previously done, and cannot undo directly, would be a violation of the spirit as well as the letter of the Constitution. For the foregoing reasons we hold that, when the law-making branch of the government creates an office, provides a salary therefor, and declares that the salary shall be paid, either directly or indirectly, such declaration constitutes a continuing appropriation which may not be increased or diminished so as to become effective during the continuance of the term of an officer already holding such office, although the law-making power may, if it desires, abolish the office and thus remove the officer and terminate his salary.

We consider next, the second proposition, to wit, that, notwithstanding there is a continuing appropriation for the salary of the legislative examiner, plaintiff herein has failed to perform the duties of his office for the period covered by the salary for which he sues and has, therefore, vacated the office. This involves an issue of fact which this court is not qualified to determine and it is necessary that the case be sent to the superior court for determination thereof. If it appears that the plaintiff has failed to

perform the duties of his office for the period provided by section 94, Revised Code 1928, the office has become vacant and plaintiff is entitled to no salary after such vacancy exists. *McCluskey* v. *Hunter,* 33 Ariz. 513, 266 Pac. 18.

But even if it appears that plaintiff has not vacated his office, there is another objection to his recovering salary for more than ninety days prior to the date of filing his complaint. Section 2804, Revised Code 1928, reads in part as follows:

"State and county officers, and ex-officers, their personal representatives or assigns, claiming the right to any salary as officers or ex-officers, due by virtue of any law of this state, shall bring action therefor within ninety days after the date said salary becomes due, and not thereafter."

While we have never expressly passed on the validity of that portion of the section above quoted, we have assumed it to be valid in the cases of *Santa Cruz County* v. *McKnight,* 20 Ariz. 103, 177 Pac. 256, and *Winsor* v. *Hunt,* 29 Ariz. 504, 243 Pac. 407. The section is in effect a statute of limitations, and, while the period set therein is short, we cannot say it is so short that it was not within the power of the legislature to fix it. *Arnson* v. *Murphy,* 109 U. S. 238, 3 Sup. Ct. Rep. 184, 27 L. Ed. 920. It is only when the period of limitations fixed by statute is so short that it, in effect, deprives a party of equal protection of the law and due process of law that an act fixing it is unconstitutional. 17 R. C. L., pp. 676–680, and cases cited. It is urged, however, that, since the salary is based upon an annual rate, that it is not due until the close of the year, and, therefore, the full amount sued for is within the statute. There might be some force to this argument were it not for the fact that the salaries of all public officers are expressly directed to be paid twice in each month on regular days not more than sixteen days apart. Sec-

tion 2799, Rev. Code 1928. This makes the proper proportion of every officer's annual salary due every two weeks, regardless of the fact that the salary is based upon the whole year, and the statute of limitations begins to run against each installment of the salary as soon as the same is "due" under section 2799, *supra*.

For the foregoing reasons the proceeding is remanded to the superior court of Maricopa county, with instructions to take the necessary evidence and determine whether or not, as a matter of ultimate fact, the plaintiff herein "has ceased to discharge the duties of his office for the period of three consecutive months, except when prevented by sickness or when absent from the state by permission of the Legislature," and, if such failure exists, the period when it existed, and to certify such fact to this court for further action.

McALISTER, C. J., and ROSS, J., concur.